# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

BRYAN RHODE,

      Plaintiff,

v.                               Case No. 3:20-cv-480-MMH-MCR

CSX TRANSPORTATION, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion for Summary

Judgment and Supporting Memorandum of Law ("Defendant's Motion") (Doc.

32), Plaintiff's opposition thereto ("Plaintiff's Response") (Doc. 39), Plaintiff's

Motion for Final Summary Judgment and Incorporated Memorandum of Law

("Plaintiff's Motion") (Doc. 33), Defendant's response in opposition thereto

("Defendant's Response") (Doc. 40), and Plaintiff's reply ("Plaintiff's Reply")

---

[1] "Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

(Doc. 41).  For the reasons stated herein, it is respectfully **RECOMMENDED**

that Defendant's Motion be **GRANTED**, and Plaintiff's Motion be **DENIED**.

## I.    Introduction

On February 21, 2017, Plaintiff, Bryan Rhode, commenced this action

against Defendant, CSX Transportation, Inc. ("CSXT"), pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001 *et seq.*  In the Complaint, Plaintiff alleges that he worked as Vice

President of Defendant's Public Safety, Health, and Environmental Team

which entitled him to receive benefits under Defendant's "Executive

Severance Plan ('Plan') [Exhibit A] if Defendant terminated him without

cause or if Plaintiff voluntarily resigned with good reason, after providing

Defendant with written notice and allowing Defendant time to cure."  (*Id.* at

¶¶ 7-8.)  Plaintiff alleges that after Defendant's former Chief Executive

Officer ("CEO") died in 2017, "Plaintiff was moved from reporting to the

[CEO], and instead began reporting to the public affairs and legal team and

was placed in a different operational structure."  (*Id.* at ¶ 9.)  Plaintiff

contends that "[t]he change in reporting hierarchy and restructuring

constituted a 'material demotion' and a 'substantial reduction in authority'

under the Plan, and thereby created a 'good reason' under the Plan to

warrant severance benefits if Plaintiff resigned."  (*Id.*)  Plaintiff further

alleges:

10.     At his annual performance review on February 12, 2019, Plaintiff and Nathan Goldman, Defendant's Chief Legal Officer ["CLO"], discussed whether severance might be available if Plaintiff were to depart the company.  Mr. Goldman reacted unfavorably to the idea of severance and directed Plaintiff to make a claim under the Plan.

11.     Plaintiff was eventually provided a copy of the Plan document.  Plaintiff informed Mr. Goldman that he would be eligible for severance benefits under the Plan if he were to depart the company because "good reason" existed based on the changes to his position and changes within CSX that resulted in a "material demotion" and a "substantial reduction in authority," as those terms are defined under the Plan.  Although they discussed Plaintiff's eligibility for such benefits in the event he departed Defendant's employment, Plaintiff never terminated his employment and never submitted any written notice of "Good Reason" under the severance plan.

12.     At a follow-up meeting on February 15, 2019, Mr. Goldman and Diana Sorfleet, Defendant's Chief Administrative Officer,[2] informed Plaintiff that any potential claim for benefits under the Plan would be denied, declared that Plaintiff had "effectively resigned," and directed Plaintiff to leave Defendant's premises under escort the following workday.

13.     Defendant therefore involuntarily terminated Plaintiff on February 15, 2019 other than for cause, entitling [] Plaintiff to benefits under the Plan.

(*Id.* at ¶¶ 10-13.)

Plaintiff asserts that on February 22, 2019, he appealed Defendant's decision to deny benefits under the Plan, which Defendant denied on July 16, 2019.  (*Id.* at ¶ 14.)  Plaintiff's request for reconsideration was also denied on

---

[2] Ms. Sorfleet is also the Plan Administrator.  (Doc. 1-1 at 14; Doc. 32 at 9.)

October 22, 2019 and he has exhausted all appeals under the Plan. (*Id.* at ¶¶ 14, 17.)

Plaintiff further contends that Defendant operates the Plan "under a conflict of interest" because it "issue[s] the policy which funds the [P]lan and decid[es] whether to pay claims from the policy." (*Id.* at ¶ 15.) He also alleges that the claims "paid under the Plan are paid from Defendant's general funds." (*Id.* at ¶ 16.) Plaintiff also maintains that "the Plan's claims administrator is a fact witness regarding a material issue, causing further conflict of interest." (*Id.* at ¶ 15.)

As relief, Plaintiff seeks to recover all benefits due to him "under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) with prejudgment interest, a full accounting of all money and other benefits that are due to Plaintiff as a result of his involuntary termination by Defendant," as well as "attorneys' fees and costs to the full extent permitted by 29 U.S.C. § 1132(g)(1)[] and any and all other further relief this Court deems just and proper." (Doc. 1 at 3-4.)

## II. Summary of Facts

### A. The Plan

At issue in this action is the CSX Corporation Executive Severance Plan ("Plan"), issued by CSXT "for eligible executive level employees of the

Company."[3]  (Doc. 1-1 at 4.)  Initially, the Plan was in effect from February

17, 2017 until February 17, 2018, but was extended for an additional year

until February 19, 2019.[4]  (*Id.*; Doc. 33-2 at 19-21.)  The purpose of the Plan

---

[3] This type of plan is called a "top hat" plan because it is "unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." (Doc. 32 at 12 n.18 (quoting 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)).  "Top hat plans are subject to ERISA, 29 U.S.C. § 1003(a), but notably, they are excluded from many individual ERISA provisions on the basic assumption that high-level employees are in a 'strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees.'"  *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006) (quoting *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001)).

[4] The First Amendment to the CSX Corporation Executive Severance Plan and Summary Plan Description, "as amended as of February 17, 2018," ("First Amendment") states in pertinent part:
. . . [T]he Plan is hereby amended to provide that each of the Covered Participants shall be eligible to receive benefits under the Plan in the event that prior to February 22, 2019 (i) the Covered Participant's employment is terminated without Cause or the Covered Participant resigns his employment for Good Reason, (ii) the Company has delivered to the Covered Participant a notice of its intent to terminate the Covered Participant's employment without Cause and the Covered Participant's employment thereafter terminates as a result of such notice or (iii) the Covered Participant has delivered to the Company a notice of intent to resign for Good Reason and the Covered Participant's employment thereafter terminates as a result of such notice (each, a "Qualifying Termination");
**RESOLVED**, that (1) the Plan shall not terminate on February 17, 2018 with respect to the Covered Participants, subject to, as applicable, their execution of a Participant Agreement, and instead shall remain in full force and effect through February 22, 2019 and shall remain in effect thereafter as to any Covered Participant who experiences a Qualifying Termination, until the terms of the benefits of the Plan are satisfied; and
(2) in accordance with the foregoing, all references in the Plan to "February 17, 2018" shall be deemed replaced by "February 22, 2019."
(Doc. 33-2 at 19-20 (AR 18-19).)

was to "provide severance protections to a critical class of Company employees during a transitional period for the Company and thereby promote the retention and focus of these employees to assist the company in this important transition." (Doc. 1-1 at 4.) The Plan further states:

> You are eligible to receive Severance Pay and other benefits under the Plan if (i) you meet the applicable eligibility criteria, (ii) your employment terminates under circumstances which entitle you to benefits, (iii) you timely sign and return an Employment Separation Agreement and Release Form, and (iv) the Employment Separation Agreement and Release Form has become effective upon satisfaction of the Release Requirement describe below. . . .
> . . .

(*Id.*) The Plan provides the following eligibility criteria for benefits:

> You will be eligible to receive severance payments and benefits from the Company as set forth in the "Severance Payments and Benefits" section of this Plan if you meet the participation requirements set forth above and your Termination Date[5] occurs for any one or more of the following reasons:
> (A)  Your employment is terminated involuntarily by the Company, other than for Cause; or
> (B)  You voluntarily terminate your employment for [G]ood [R]eason, and
>> (1)  in either case your Termination Date occurs prior to February 17, 2018 or, as applicable, (2) (i) the Company has notified you of your involuntary termination by the Company, other than for Cause prior to February 17, 2018 or (ii) you have provided the Company notice of your election to terminate for Good Reason prior to February 17, 2018 and the Company has subsequently waived its right to cure or the 30-day period in which the Company may

---

[5] The Termination Date is defined as "[t]he date on which your employment with the Company and its affiliates terminates for any reason." (*Id.* at 15.)

cure has subsequently elapsed without cure, as provided
below.

To qualify for severance payments and benefits under the
Plan upon voluntary termination for Good Reason, you
must notify the Company in writing of your election to
terminate for Good Reason, specifying the event
constituting Good Reason, within 10 business days after
the occurrence of the event that you believe constitutes
Good Reason.  Failure for any reason to give written notice
of termination of employment for Good Reason in
accordance with the foregoing will be deemed a waiver of
the right to voluntarily terminate your employment for that
Good Reason event.  The Company will have a period of 30
days after receipt of your notice in which to cure the Good
Reason.  If the Good Reason is cured within this period, you
will not be entitled to severance payments and benefits
under the Plan.  If the Company waives its right to cure or
does not, within the 30-day period, cure the Good [R]eason,
you will be entitled to severance payments and benefits
under the Plan subject to the terms and conditions hereof,
and your actual Termination Date will be determined in
the sole discretion of the Company, but in no event will it
be later than 30 calendar days from the date the Company
waives its right to cure or the end of the 30-day period in
which to cure the Good Reason, whichever is earlier.

(*Id.* (indentations modified).)

The Plan also includes an "Ineligibility" provision, stating in pertinent

part that an employee will not be eligible for severance payments and

benefits under the Plan if the Termination Date "occurs by reason of," *inter*

*alia*, "[v]oluntary termination or voluntary retirement other than for Good

Reason."  (*Id.* at 5.)

Under the Plan, Good Reason is defined as follows:

"Good Reason" means the occurrence of any one or more of the following events which occur without your express written consent:

(A)     A material reduction in your Base Salary;

(B)     A reduction in your job grade or title constituting a demotion;

(C)     A substantial reduction in your authority or substantial detrimental change in your duties, which, in either case, represents a material demotion, regardless of whether the reduction or change is accompanied by an actual diminution of your title or grade level; or

(D)     A change in the principal location of your job or office . . . .

(*Id.*)

The Plan also sets forth the following procedures for making claims for benefits:

### *Claim for Benefits*

If you believe that you are entitled to payments and benefits under the Plan that are not provided to you, or you disagree with any other action taken by the Plan Administrator with respect to the Plan, then you may submit a claim to the Plan Administrator in writing. A claim must be made in writing and submitted within 6 months of your Termination Date. In the event you make a claim for benefits beyond six months of your Termination Date, then you are expressly precluded from receiving any severance payments and/or benefits under the Plan.

### *Claims Review Procedures*

You will be notified in writing by the Plan Administrator if your claim under the Plan is denied.

If a claim for benefits under the Plan is denied in full or in part, you may appeal the decision to the Plan Administrator.

To appeal a decision, you must submit a written document through the U.S. Postal Service or other courier service appealing the denial of the claim within 60 days after you receive notice of the claim denial described above. You may also include information or other documentation in support of your claim.

You will be notified of a decision within 90 days (which may be extended to 180 days, if required) of the date your appeal is received. This notice will include the reasons for the denial and the specific provision(s) on which the denial is based, a description of any additional information needed to resubmit the claim, and an explanation of the claims review procedure. If the Plan Administrator requires an extension of time to respond to your appeal, you will receive notice of the reason for the extension within the initial 90-day period and a date by which you can expect a decision.

If the original denial is upheld on first appeal, you may request a review of this decision. You must submit a written request for reconsideration to the Plan Administrator (as listed below) within 60 days after receiving the denial.

You can review all plan documents in preparing your appeal and you may have a qualified person represent you during the appeal process. Any documents or records that support your position must be submitted with your appeal letter.

The case will be reviewed, and you will receive written notice of the decision within 60 days (which may be extended to 120 days, if required). The written notice will include the specific reasons for the decision and specific reference to the Plan provision(s) on which the decision is based.

Any decision on final appeal will be final, conclusive and binding upon the parties. If the final appeal is denied, however, you will be advised of your right to file a claim in court. It is the Company's intent that in any challenge to a denial of benefits on final appeal under these procedures, the court of law or a professional arbitrator conducting the review will apply a deferential ("arbitrary and capricious") standard and not a de novo review.

. . .

(*Id.* at 10-11 (footnotes omitted).)

The Plan also provides the Plan Administrator with discretionary

authority:

> The administration of the Plan is the responsibility of the
> Plan Administrator. The Plan Administrator has the
> discretionary authority and responsibility for, among other
> things, determining the eligibility for benefits and construing and
> interpreting the terms of the Plan. In addition, the Plan
> Administrator has the authority, at its discretion, to delegate its
> responsibility to others.

(*Id.* at 11.) The Plan Administrator is listed as the Senior Vice President and

Chief Administrative Officer—in this case Ms. Sorfleet. (*Id.* at 11, 14.)

## B.    Relevant Administrative Records[6]

In a letter dated February 19, 2019, Ms. Sorfleet, as Executive Vice

President ("EVP") and Chief Administrative Officer, informed Plaintiff that

CSX accepted his "decision to resign from the company, effective February 15,

2019." (AR 1.) The letter also informed Plaintiff he would be paid through

March 1, 2019, he would receive a prorated "payout for any accrued but

unused vacation," and his health and welfare benefits would continue

---

[6] The administrative record was filed as Exhibit A to Defendant's Motion
(Docs. 32-1 & 32-2), and is bates-numbered CSXT-Rhode 000001-000064. All
citations to the administrative record in this Report and Recommendation are in the
format "AR [page number]" with the extraneous zeroes omitted.

through March 31, 2019.  (*Id.*)  The letter also reminded Plaintiff of his obligation to comply with the terms of his October 16, 2018 Confidentiality, Non-Solicitation and Non-Competition Agreement, a copy of which was purportedly attached.[7]  (*Id.*)

In a letter dated February 22, 2019, Plaintiff responded to Ms. Sorfleet stating, in part, as follows:

> I certainly appreciate having had the chance to serve CSX and believe that I did my job well.  I am, however, disappointed and surprised with how we reached this point.  I initiated a discussion in good faith about potentially departing if severance was available.  As I told you when we met, I was willing to stay as long as necessary and allow for a smooth transition if an agreement could be reached.  I did not think raising the issue would lead to me being told I had effectively resigned and need not return to work on the same day I was told the Company would not agree to any severance.  I was willing to continue and had not made a decision about what I would do if the severance package was denied.  If there is any process to appeal the decision to terminate me, please consider this my appeal, although I don't know how much of an appeal there can be since I had to turn in my credentials, my access has been cut off, and a notification of my departure has been sent to Company leadership.
> . . .

(AR 2.)

On February 25, 2019, Ms. Sorfleet responded:

> I have received your February 22nd letter.  Based on our recent discussions and the discussions you had with Nathan Goldman over the last few months, I believe you misunderstand the circumstances surrounding your departure from the company.

---

[7] This document is not included in the Administrative Record.

As you know, during the second half of 2018 you advised Nathan that you were planning on leaving CSX in early 2019. Despite Nathan's assurances that you were performing your job well, that your position was not in jeopardy, and his willingness to further your development, you advised Nathan that you still planned on leaving. When you asked whether you would receive a severance package, Nathan informed you that it was not available given that you, for your own reasons, had decided to leave.

On February 12, [2019][,] during your 2018 year-end review, Nathan advised you that you had done a good job and would receive a 200% MICP payout. Despite this good review, you told Nathan that you planned on leaving CSX and would like to do so soon. During this meeting you again asked about receiving a severance package. Nathan once again advised that because you were resigning a severance package was not available. *You and I met the same day after your year-end review.* I reiterated Nathan's comments that you were doing a good job and the company was committed to your development, but that a severance package was not available *given that you were resigning from the company*. During our next meeting on February 15, both Nathan and I asked if there was any additional information you would like to share *regarding your resignation*. At that time you did not provide us with any information and we accepted your resignation.

We have reviewed the circumstances surrounding your departure after receiving your letter and again confirm that you were not terminated from CSX, but rather you resigned for your own reasons. As a result, you are not eligible for a severance package. . . .

(AR 3 (emphasis added).)[8]

Plaintiff responded on March 28, 2019, stating:

---

[8] A copy of the Plan and the First Amendment Plan appear after the letter. (*See* AR 4-20.)

I was disappointed to receive your letter dated February 25, 2019. As I stated in my previous letter, I initiated a discussion concerning my career prospects and future with CSX in good faith. Part of that discussion involved the possibility of departing if severance was available. I told you both I was willing to stay as long as necessary and allow for a smooth transition if an agreement could be reached. I was willing to continue in my role and had not made a decision about what I would do if the severance package was denied. I did not expect you to tell me that I had effectively resigned, and to be terminated when you told me that I would not be eligible for severance.

It saddens me that you and Nathan would incorrectly summarize the circumstances of my departure. I did not at any point tell you or Nathan I would depart in early 2019, or that I was resigning. The circumstances and abruptness surrounding my termination belie your version of events. Unfortunately, Nathan's actions are not entirely surprising considering previous issues I have encountered with him. I see now the reason for you writing the letter is that you have realized your decision to terminate me before February 22, 2019 now definitely entitles me to severance under the Executive Severance Plan. The fact that you and Nathan are trying to save face by misrepresenting the facts is troubling.

Please consider this my appeal for severance under the Executive Compensation Plan. Your recent letter makes me question your role as the reviewing authority in this process, but it appears you are the one who makes decisions on severance issues. If you will not allow me to return, I am entitled to the protections of the Plan the Board of Directors put in place. In addition, to support my claim under the Plan provisions I am entitled to submit documentation. In that regard, I request you consider, and make available to me, any emails, text messages, or other communications between you, Nathan, Jim Foote, and any other CSX employee involved in my termination, or in the review of my request, to consider the payment of the severance package. Please notify me if there is anything else I need to do from an administrative standpoint.

(AR 21.)

On April 9, 2019, in her capacity as the Plan Administrator, Ms. Sorfleet responded to Plaintiff's March 28, 2019 letter, stating that she was responding to Plaintiff's "claim for benefits under the Plan" as follows:

> The Plan, a copy of which is enclosed, provides severance benefits to employees who meet the eligibility criteria set forth in the Plan. These criteria include either (a) the employee is terminated involuntarily by CSX other than for Cause (as defined in the Plan) or (b) the employee voluntarily terminates employment for Good Reason (as defined in the Plan). The Plan further provides that employees are not eligible if they voluntarily terminate employment other than for Good Reason. Because you voluntarily resigned from employment and did not meet the Good Reason definition, you are not entitled to severance benefits under the Plan.
>
> In your letter, you asked for copies of certain documents. The Plan is governed by [ERISA], which entitles you to review all documents, records, and other information that were submitted, considered, generated, or relied upon in reviewing your claim for benefits, as well as the claims procedures, which are included in the Plan document. Enclosed are copies of the following, which constitutes all of those documents:
>
> 1. CSX Corporation Executive Severance Plan and Summary Plan Description;
> 2. First Amendment to the CSX Corporation Executive Severance Plan and Summary Plan Description;
> 3. Letter dated February 19, 2019 from Diana Sorfleet to Bryan Rhode regarding your resignation;
> 4. Letter dated February 22, 2019 from Bryan Rhode to Diana Sorfleet regarding your resignation;
> 5. Letter dated February 25, 2019 from Diana Sorfleet to Bryan Rhode regarding your resignation; and
> 6. Letter dated March 28, 2019 from Bryan Rhode to Diana Sorfleet filing a claim for benefits under the Plan.
>
> If you wish to appeal this determination, you may do so by submitting a written appeal at the address listed above no later

than 60 days from the date on which you received this letter. The appeal should include a full description of the pertinent issues and basis of the appeal. You may submit documents or records that support your position with your appeal letter. If you disagree with the decision on your appeal, you will have the right to bring a civil action under Section 502(a) of ERISA, but must file the action in court within one year of the date of the final denial of your claim.

(AR 22.)

On May 7, 2019, Plaintiff responded to Ms. Sorfleet's April 9, 2019 letter, reiterating his previous position, including that he "initiated a discussion in good faith regarding" his "future career prospects at an appropriate time–[his] end of year review" (AR 23), and adding:

Part of that discussion involved the possibility of departing if severance was available. It was a discussion similar to ones other Vice Presidents have had with their supervisors, and they did in fact receive severances. I informed both of you I was willing to stay as long as necessary and allow for a smooth transition if an agreement could be reached. I had not made a decision about what I would do if severance was denied, and I did not voluntarily resign.

You and Nathan informed me of my termination on February 15, 2019. Both my previous letters to you on this topic stated they were appeals of that decision. Your latest letter now states that I can appeal your decision to deny severance. Perhaps there has been confusion since you have not strictly adhered to the process described in the Executive Severance Plan up to this point. Nevertheless, for the third time, please consider this my appeal or a request to review the decision on my first appeal.

I appreciate you attaching documents with your letter. As you know, these were all documents I already have or am aware of. Unfortunately, your April 9 letter was not responsive to my request . . . . I believe any such documents, communications, or

testimony regarding such discussions is critical to support my request for severance. I would also ask you to produce and consider in my appeal any documents in the company's possession, to include board resolutions and minutes, regarding my promotion to, and demotion from, reporting to the CEO (dual or otherwise). Please also consider and produce any documentation, press releases, or public statements regarding the company's shift to, and promotion of, a two region operating structure and the subsequent diminution of my authority with the creation of dual reporting responsibilities for a significant segment of the Public Safety, Health & Environment Team. Specifically, please consider and produce any documents or organizational charts showing dual/dotted line reporting structure of the nearly 100 officer police department to the Operations Team.

As you are aware, after its passage by the Board of Directors, the Executive Severance Plan was never made available to covered employees. Instead, an email and one page PowerPoint slide were provided. Please provide and include for the record those two documents for consideration of my appeal.

Since you and Nathan have chosen to misconstrue the facts surrounding my departure in order to prevent taking responsibility for terminating me, I would ask you to consider the absence in the record of any documents or communications from me that I either intended to resign in early 2019, or did in fact resign. I would also ask that you consider the absence of any documents or communications between me and any superiors, subordinates, or colleagues discussing or making preparations for a departure by me in early 2019. These would be the types of documents that would certainly be available if I, as you claim, had informed my supervisor as early as the second half of 2018 that I was planning on leaving CSX in early 2019. The bottom line is the abruptness of my departure belies your claims that I involuntarily resigned.

(AR 23-24.) Plaintiff then reiterated his concern regarding Ms. Sorfleet's "conflict of interest in making this decision" and included a sworn affidavit regarding the circumstance surrounding his alleged termination. (AR 24.)

In his Affidavit, Plaintiff also averred, in pertinent part, as follows:

2.      I was employed by [CSX] for over five years. In that time, I held several positions, including Regional Vice President of Government Affairs and Vice President of Internal Audit.

3.      In 2017, Hunter Harrison was hired as CEO of CSX. Immediately prior to Mr. Harrison's hiring, CSX's Board of Directors instituted an Executive Severance Plan ("the Plan") to retain certain covered executives through the transition period.

4.      Management never distributed the Plan documents to covered employees.

5.      At the time the Plan was instituted, I was Vice President of the Public Safety, Health, and Environmental Team, which consisted of a police department, hazmat team, environmental group, public safety call center, infrastructure protection crew, and medical staff.

6.      In Fall 2017, there was a large turnover of senior leadership team, including my supervisor. Following my supervisor's departure, I began reporting to the CEO, Mr. Harrison.

7.      In December 2017, Mr. Harrison died and was replaced by Jim Foote.

8.      The Board continued the Plan for an additional year as Mr. Foote assumed the CEO position.

9.      I continued reporting to the CEO, Mr. Foote, in my position, until February 2018, when Nathan Goldman, Chief Legal Officer, informed me that, upon Board approval, I would no

longer report directly to the CEO and would begin to report to the Public Affairs and Legal Team ("PALT").

10.     This change in reporting structure was a "material demotion" under the Plan, and therefore qualified me for severance benefits.

11.     Later in 2018, CSX changed its operating structure, resulting in a split of the Public Safety, Health, and Environmental Team.  This change constituted a "substantial reduction in [my] authority" under the Plan, and therefore qualified me for severance benefits.

12.     On February 12, 2019, at my annual performance review, Mr. Goldman and I discussed my future and career prospects.  I informed Mr. Goldman that I would be willing to depart from my position if an agreement on severance could be reached.  I informed Mr. Goldman that I had no immediate plans to leave and that I was willing to stay in my position as long as necessary to ensure a smooth transition.  Mr. Goldman reacted unfavorably to my statements, and told me not to discuss the matter with Chief Administrative Officer Diana Sorfleet until after he had discussed it with her.  Mr. Goldman also told me he would discuss the matter with Mr. Foote.

13.     Mr. Goldman asked me to make a claim under the Plan.  I had never seen the Plan, and therefore asked CSX Pay and Benefits Department to provide me the Plan document, which I was eventually provided.

14.     On reviewing the Plan document, I determined I was eligible for severance benefits as a result of the various changes to CSX resulting in my demotion and reduction of authority in my position.

15.     I had a follow[-]up meeting with Mr. Goldman and Ms. Sorfleet on February 15, 2019.  At this meeting, Mr. Goldman informed me my request for severance benefits under the Plan was denied and that I had "effectively resigned," and that my last day with CSX would be March 1, 2019, and that I no longer needed to return to work.

16.     I did not resign my employment from CSX and was terminated without cause by Mr. Goldman at the February 15, 2019 meeting, further entitling me to severance benefits under the Plan.

17.     I was required to remove my possessions from my office over the weekend, and gave a brief farewell to my team on February 19, 2019.  Ms. Sorfleet required a Human Resources representative to be present at this farewell, and that I return my company access badges and credit cards, and depart from the property immediately thereafter.

(AR 25-27.)

On July 16, 2019, Ms. Sorfleet sent Plaintiff an Appeal of Claim Denial. (AR 29-30.)  Ms. Sorfleet confirmed her review of Plaintiff's appeal and determined it did not support his eligibility for benefits under the Plan.  (AR 29.)  Ms. Sorfleet summarized the eligibility requirements under the Plan and explained that employees who voluntarily terminate their employment other than for Good Reason are not eligible for severance pay or benefits. (*Id.*)  She further recited the definition of Good Reason under the Plan[9] and stated: "[i]n your appeal, you appear to assert that you had Good reason under (c) above" and "[y]ou do so by claiming that you were 'promoted' to

---

[9] Ms. Sorfleet specifically stated: "The Plan defines Good Reason as one of the following which occur without the employee's written consent: (a) a material reduction in base salary, (b) a reduction in job grade or title constituting a demotion, (c) a substantial reduction in authority or substantial detrimental change in duties that represents a material demotion, or (d) a change in the principal of your job or office of at least 50 miles."  (AR 29.)

directly reporting to the CEO and then 'demoted.'" (*Id.*) Ms. Sorfleet

explained:

> While there were ongoing changes in the organization and you briefly had a dual reporting relationship to another executive and Nathan Goldman, Executive Vice President and Chief Legal Officer, in 2017, at all times Mr. Goldman had authority with respect to oversight of your position, including performance reviews and pay. There was no decrease in your authority, compensation or duties during this dual reporting period or afterwards. Similarly, the company's shift to a two region operating structure had no impact on your authority, compensation or duties.
>
> Based on my review of your most recent correspondence and the facts surrounding your voluntary resignation, there is nothing to indicate that you voluntarily resigned for Good Reason as defined in the Plan, and, in any event, you never provided the required notice regarding any event you considered to be Good Reason. Further, you were not involuntarily terminated, as you told both me and others at the company that you no longer wanted to work at CSX and were ready to leave as soon as reasonably possible. Because you voluntarily resigned from employment and did not meet the Good Reason definition, you are not entitled to severance benefits under the Plan.
>
> In your appeal letter, you indicated that you thought it was your third appeal. As clarification, we treated your March 28, 2019 letter as an initial claim for benefits under the Plan because it was the first formal written request that you made for severance benefits under the Plan. In your February 22, 2019 letter, you indicated that you thought you had been involuntarily terminated and stated that you were appealing that decision (despite the fact that you told both me and others at the organization that you no longer wanted to work at CSX and were ready to leave as soon as reasonably possible). Because the February 22, 2019 letter did not indicate you were requesting severance benefits, it was not treated as a claim for benefits under the Plan.

> In your appeal letter, you also indicated that the Plan document
> was never made available to employees. The Plan document was,
> in fact, made available to employees. You also requested a copy
> of the email and PowerPoint describing the severance benefits
> that was originally distributed to employees. Those documents
> are enclosed.

(AR 29-30.) Ms. Sorfleet also reminded Plaintiff of his option under the Plan to request reconsideration of this determination and of his right to bring a civil action under ERISA. (AR 30.)

On September 12, 2019, Plaintiff responded to the Appeal of Claim Denial raising various challenges. (AR 31-32.) Plaintiff maintained that only a summary of the "Plan's benefits on a single slide were provided to executives, but the actual written Plan never was." (AR 31.) He also asserted that when Mr. Goldman told him to make a claim under the Plan on February 12, 2019, Plaintiff had "never seen the document" and could not locate it in the Company's internal system. (*Id.*) He also claimed he had spoken with other CSX vice presidents, but none of them had seen the Plan. (*Id.*) According to Plaintiff, he contacted the VP of pay and benefits, who asked why he wanted to see the Plan, and Plaintiff "was given the impression" that Ms. Sorfleet would have to "authorize" Plaintiff's viewing of the Plan. (*Id.*)

Plaintiff argued that the Plan was different from a similar plan, the Change of Control Agreement, which was broadly distributed to executives,

and that the key difference was that "it did not contain any 10 day notice provision for voluntary termination for 'Good Reason.'" (*Id.*) Plaintiff included a copy of that agreement and alleged that "[c]onfusion over these two plans was common." (*Id.*) Plaintiff also alleged:

> As you know, the new executive leadership took a dim view of the Plan as having been imposed on them by Directors who had been on the Board prior to the shake-up (the Plan even says in the preamble it is meant to cover critical employees during the "transitional period"). In light of the significant numbers of other Vice Presidents departing the company in the months prior to my termination, including those paid severance (a senior vice president of operations and vice presidents of labor relations and sales & marketing) for reasons involving discrimination, abusive behavior, or misconduct on the part of the Executive Team members, there was even less appetite for further payouts when I was terminated.

(*Id.*)

Plaintiff also asserted that Ms. Sorfleet failed to provide the documents he requested and that he could not provide such documents as he no longer had access to them, her failure to produce such documents significantly hindered his ability to document his position, and the requested documents "should be part of any meaningful review of [his] claims to severance." (*Id.*) Plaintiff continued to argue his position as follows:

> I reported directly to the CEO, and I was told <u>by</u> Mr. Harrison that I reported directly to him. During the period I reported to the CEO, my understanding of my reporting status was never contradicted by Mr. Goldman. Even if it was a dual role (which was never indicated to me until after February 12, 2019), it certainly did not function that way. To suggest that going from

reporting directly to the most prominent CEO in the industry . . . to a former peer was simply part of "ongoing changes" in the organization strains credulity.  It was a substantial demotion and was viewed as such in the organization.

(AR 31-32 (emphasis in original).)

Plaintiff also made various allegations regarding his purportedly strained relationship with Mr. Goldman, rebuffing the notion that they were on "good terms" or that Mr. Goldman was interested in furthering Plaintiff's development.  (AR 32.)  Plaintiff alleged, *inter alia*, that Mr. Goldman gave Plaintiff a "second middling review since [he] began reporting to him" and that his "overall performance evaluations from Mr. Goldman were a notable downgrade from [] previous reviews at the company."  (*Id.*)  Plaintiff claimed he "worked very hard to maintain a functioning working relationship with him and largely succeeded," but stated, "[a]s [Mr. Goldman] knows, our relationship was strained and had been since he inappropriately intervened in an internal audit when I was head of that department."  (*Id.*)  According to Plaintiff:

In 2016, [Mr. Goldman] suppressed a key finding regarding safety in a highly sensitive government billing audit.  Failure to address that issue may have been a contributing factor in a serious safety incident.  The written 360 Leadership Review by outside consultants the Company commissioned on my behalf contains numerous statements by Mr. Goldman in reference to our conflict over that specific audit.

(*Id.*)  Plaintiff asked that Ms. Sorfleet "consider Mr. Goldman's comments in that review for inclusion in the record and discuss with members of the internal audit team Mr. Goldman's intervention in that audit for a more complete understanding of what occurred."  (*Id.*)

Plaintiff added:

> His lack of confidence in me and my [sic] the lack of future career prospects under him was the impetus – at the appropriate time of my end of year review – for the discussion around my possible departure if severance was available.  It was then he instructed me that if the Company was to consider severance, I had to make a claim under the Plan and I could not speak with you until after he had first spoken to you.  By the time I did get to see you, you made it clear you would follow his lead on the matter.
>
> I came to you and Mr. Goldman in good faith believing, based on the treatment of previous similarly situated Vice Presidents, that mine was the type of circumstance in which severance might be a possibility.  I was downgraded in my position, and was placed in a hostile position with somebody who did not wish for me to continue in my role.  After I discussed the possibility of departing under the good cause provision, you and Mr. Goldman terminated my employment.  I would appreciate your objective review of the facts, which clearly should lead to a determination that I am due severance. . . .

(*Id.*)

By letter dated October 22, 2019, Ms. Sorfleet responded to Plaintiff's request for reconsideration of the final decision to deny his claim for benefits under the Plan.  (AR 58-59.)  Ms. Sorfleet, in her capacity as the Plan Administrator, reviewed Plaintiff's request for reconsideration and "determined that no change to the final decision to deny [his] claim for

benefits [was] warranted." (AR 58.) Ms. Sorfleet stated that in his previous

letter, Plaintiff raised a "new issue" regarding his relationship with Mr.

Goldman, which she addressed as follows:

> You assert that your professional relationship with Mr. Goldman
> was strained and you believe this should be considered in
> connection with your claim. In support of your assertion that this
> relationship was strained, you allege that Mr. Goldman
> "inappropriately intervened in an internal audit" and
> "suppressed key findings." I have completed my review of your
> allegation and consulted those who were involved. It appears
> that you are referring to an internal audit on flagging that was
> conducted at the request of the law department.
>
> The primary issue that was debated between Audit and Legal
> was whether the separate flagging brochure you created should
> be included as part of the flagging audit. I have confirmed that,
> for legal privilege reasons, it was ultimately decided with Ellen
> Fitzsimmons' involvement that it should not. There was one item
> raised during the audit that related to hours billed by some
> flaggers, which you had included in the brochure. This item was
> moved during the drafting process, and ultimately included in the
> "additional considerations" section of the audit report. However,
> there is no evidence that the movement of this item was the
> subject of significant ongoing dialogue with Mr. Goldman, nor is
> there evidence of a "strained" relationship between you and Mr.
> Goldman as a result. Thus, this change in the organization of the
> report does not support your allegation that your relationship
> with Mr. Goldman was strained. I also found no support for your
> allegation that this change was inappropriate or a suppression of
> a key finding. Regardless, even if you had a strained relationship
> with Mr. Goldman, this does not impact your ineligibility for
> benefits under the Plan.
>
> As mentioned in my July 16, 2019 letter, you have the right to
> bring a civil action under [ERISA], but must file it within one
> year of July 16, 2019, the date of the final decision regarding your
> claim for severance benefits under the Plan. Because you have
> exhausted your administrative remedies, and based on the prior

information provided in my prior correspondence, we consider the matter closed.

(AR 58-59.)

Also included in the administrative record is a memorandum drafted by

Ms. Sorfleet titled "Discussion Notes: Bryan Rhode," which reads:

> On February 12, 2019[,] Nathan Goldman informed me that during the course of a year-end-review and discussion about 2019 goals, Bryan Rhode let Nathan know that he planned to leave the company. Bryan mentioned to Nathan that they needed to work out the details of the change-in-control. Nathan said he clarified to Bryan that there was no change in control and probed Bryan to understand what he was expecting. Bryan told Nathan he was expecting a VP severance because he no longer reported to the CEO. Nathan told Bryan that he did not believe that dual reporting, which ended over a year ago, constituted good reason under the plan. He told Bryan that he should meet with me.

> *I met with Bryan that same afternoon.* Bryan said he did not want to get into a legal battle about whether or not he qualified for the severance plan. He said he was asking because he felt it was the right thing for the company to do since he took a big risk coming to Jacksonville several years ago and his wife never found work. He mentioned that his advocate, Ellen Fitzsimmons, had left and he did not see a path to the C-Suite under new or future leadership. He said he made the sacrifice to move here because Ellen had committed a path to the C-[S]uite. He also felt that in his career he had moved every 18 months and that his career had stagnated.

> We discussed that he had a very important role in the company and we did not want him to leave. I also said that there were no guarantees for promotions but we were committed to his development. I asked him if there was anything specific that he could reference that would indicate there was good reason under the plan. He mentioned that he had reported to the CEO. I

replied that he never stopped reporting to the CLO[10] position so we would not equate that to a diminution of duties. I asked if there was anything else and he offered to highlight the sections of the plan and send them to me if it was helpful. I[] [s]aid he [sh]ould but he replied that he did not want to do that and get into legal arguments. He had a document that was highlighted already but did not share it.

I asked why he did not notify the company at the time of Mr. Harrison's passing. He said he wanted to stay around to see what would happen but since he hasn't changed jobs or been placed in a [C]-[S]uite role he wanted to try something else. He said he may start his own business or at 43 heave [sic] time to work in another company and attain [C]-[S]uite level. He mentioned that he was happy for other people who were getting opportunities, and mentioned Amy Rice specifically. He said he had no bad feelings about the company or the results, but wanted to move on. He said the severance would give him time to look for something.

I told him that it was not a good business decision for the company to pay someone to leave when the person is doing a good job in their role. I reiterated that he had a significant role in a successful company and we were committed to his development. I told him I would follow up with Nathan and get back to him either on Friday when Nathan returned or early next week.

Michelle Mullen called me the morning of February 13th to tell me that Bryan had called her and asked her for a copy of the enhanced VP severance plan. She provided him with a copy.

On Friday, February 15, Nathan and I met with Bryan. We asked if there was any other information to share. He did not have anything so we told him we accepted his resignation effective immediately and [would] pay him through March 1, 2019. We agreed that he would clear out his office over the weekend and notify his team on Tuesday, February 19 (Monday

---

[10] Here, Ms. Sorfleet appears to refer to the Chief Legal Officer (CLO) position, which was held by Mr. Mr. Goldman during the relevant period in this case.

was a holiday). He said he did not want this to be contentious
but he would notify the company in writing of his resignation and
good reason for the severance. I asked again if there was
anything specific he wanted to share other than his assertion
that the reporting relationship created a diminution of duties.
He said he would put it in writing. After the meeting I sent
Bryan a note asking that he include his HRBP, Shannon
Harrington, in the Tuesday morning meeting notifying his team.

On February 19th Bryan met with his team and left. He did not
submit anything in writing so[,] on February 20th[,] I sent a letter
to Bryan documenting that we accepted his resignation and that
the terms of his non-compete were still in effect.

(AR 60-61 (emphasis added).)

Also in the administrative record is a detailed email from Mr. Goldman

to Ms. Sorfleet, copying Michael Burns, dated February 20, 2019, with the

subject line: "Bryan Rhode Departure." (AR 62-64.) The email reads as

follows:

At last year's midyear review, I discussed Bryan's longer term
progression at CSX and where he saw himself down the road. He
said his goal was to be in the C suite but questioned whether that
was an option at CSX now that Ellen was gone and new
leadership was running the company. I expressed some surprise
that he thought his long term success was linked to one
individual or that there were obstacles to his advance related to
the new leadership team and that I was raising the issue because
as his manager I wanted to work with him on his talent
development both for his sake and the good of the company. I
explained that if his desire was to be in the C suite, given that he
started in State Relations, was VP Internal Audit and now VP
PSH&E, all areas within my responsibility and most importantly
that he was a lawyer, my job was the most logical path. He said
he hadn't been a practicing attorney or even in a job where he
provided legal advice for many years and he didn't see that as a
viable option. I told him I would work with him to give him the

opportunity but he was correct he would likely need to work in the Law Department. He said he didn't want to do that. I then said I would support him if he wanted to move into one of the other major areas as long as it made sense and there was an opportunity available. He thanked me and said he would think about it.

(AR 62.)

Mr. Goldman continued:

As we met periodically over the balance of the year[,] he never brought this up again and then a few months ago[,] during one of our regularly scheduled check in meetings, he said he was working on a restructure of his department to better align resources and that he had a conversation with Jim Schwichtenberg about moving some of his functions into that organization and outsourcing some others such as medical. I was totally surprised by this and asked him on whose authority he was doing this, that we would not move critical compliance and public safety groups into Operations, that they were in my organization for important governance and compliance reasons and that in any event I had already discussed with Dekra as part of their major safety review and they emphatically supported the current reporting structure. In fact they said moving such critical compliance and public safety functions into Operations was the opposite of a best practice and it should not happen. The VP [of] Safety felt the same. As I reflected on what he would have left in his organization, it was very little and I asked him if he was trying to work himself out of a job. That is when he told me for the first time that he planned to leave CSX in 2019. He reiterated there wasn't a path for him here to the C suite, that his champion and advocate, Ellen Fitzsimmons was gone and he was going to move on. I told him I thought he was doing a good job, that his work was valued and I did not want to see him go. I emphasized that I wanted him to stay, his job was not in jeopardy, and I had no intention of abolishing his position, though if he left[,] I would have to consider all organizational options and redesign. He then said[,] does that mean the severance package is not available and I said of course not. I reminded him that the plan didn't exist for someone who didn't

meet the severance plan criteria, that it wasn't there for somebody who for their own personal reasons wanted to raise their hand and leave. He said he understood, [sic] would like it to apply but in any event still planned on going.

(*Id.*)

Mr. Goldman claims they had "no further discussions about this until" they met on February 12, 2019 for Plaintiff's 2018 review. (*Id.*) According to Mr. Goldman:

> On February 12, [2019,] I gave Bryan his 2018 review and explained that he had met his goals and did a good job. As a result[,] he was rated achieved expectations and would receive a 200% bonus payout. I provided him his compensation sheet and then turned to 2019 goals. I said in light of what he told me a few months ago before we discussed 2019 goals I would appreciate knowing if he wanted to continue at CSX[,] emphasizing that I certainly wanted him to. He said no, he was leaving and would like to do so soon. He said we just need to work out the timing and the details. I asked what he meant by the details other than his final day. He was vague and spoke somewhat in circles about the need to work things out. I again asked what he was talking about and he said the change in control agreement. I asked him what that had to do with anything as there had been no change in control as defined in the agreement and even if there had been, which was an incredible stretch that it had a double trigger. In other words, there would have to be a CIC and he was terminated. He then said he was talking about the protections for VPs and above. I said are you referring to the Executive Severance Plan that applied to VPs and that was expiring Friday, February 22. He said he thought that's what he was talking about. I told him I still didn't understand because he was resigning and the plan didn't apply to his circumstances. He kept responding by saying he hoped we could work this out and that things didn't get contentious. I kept asking why would things get contentious when he had quit and the plan didn't apply. He then said he thought it did. I asked why and he said something about a change in his reporting

status. I asked what he was talking about and he said the fact that for a few months he was a dual report to me and the CEO. I said are you talking about the temporary dual report that was set up in November 2017 as a result of some board action? He said yes and that a couple of months later (after EHH passed away) that was undone. I told him I was surprised he thought that triggered good reason under the plan, that at no time did he ever not report to me, that his organization and budget always remained in my organization and quite frankly I was shocked by his position. I also pointed out that even if there was any basis to his point, which in my opinion there wasn't, that it was over a year ago and under the plan he had to send notice in writing within 10 days of the event occurring and the company then had 30 days to cure. At that point he said there wasn't anything else to discuss and asked if he could speak with Diana Sorfleet. I said of course, that I was going out of town the next two days but let's talk again on Friday. He said ok.

(AR 63-64.)

Mr. Goldman also stated that he and Ms. Sorfleet then met with

Plaintiff on Friday, February 15, 2019:

At that time we asked if he had any other information to share with us about his resignation but in any event we accepted it and it would be effective March 1. He said he really didn't have anything else [to] say other than he would prefer to work this out so things didn't get contentious. We said they didn't need to be contentious[,] but he had resigned and the plan did not apply. He said he would get us a letter the following week explaining why he believed it did. He also said he would come in over the weekend to clear out his things and asked if he could meet with his team on Tuesday, February 19 to let them know he was leaving. We said of course but asked that Shannon Harrington be present. He then left.

(AR 64.)

### III.   Standard of Review

#### A.   Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "In an ERISA benefit denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.*, No.: 01-14097, 2005 WL 894840, *7 (11th Cir. Mar. 16, 2005) (per curiam) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)) (internal quotation marks omitted). *Accord Clark v. Hartford Life & Accident Ins. Co.*, Case No.: 8:05-cv-67-T-23MAP, 2006 WL 890660, *2 (M.D. Fla. Apr. 6, 2006).

"[W]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exist, do not apply." *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006). As explained in *Crume*:

> In a case like this, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's . . . decision, it is difficult to ascertain how the "normal" summary

> judgment rules can sensibly apply.  After all, the pertinent
> question is . . . whether there is a reasonable basis in the record
> to support the administrator's decision . . . .  In other words,
> conflicting evidence . . . cannot alone create an issue of fact
> precluding summary judgment, since an administrator's decision
> that rejects certain evidence and credits conflicting proof may
> nevertheless be reasonable.

*Id.* at 1273.  *See also Pinto v. Aetna Life Ins. Co.*, No. 6:09-cv-1893-Orl-22GJK, 2011 WL 536443, *8 (M.D. Fla. Feb. 15, 2011) ("There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would.").

## B.    ERISA Standard of Review

Under ERISA, a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A claimant suing under this provision bears the burden of proving his entitlement to contractual benefits; however, if an insurer claims that a specific policy exclusion applies to deny the insured benefits, then the insurer must generally prove the exclusion prevents coverage.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).

Moreover,

> ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.  However, the Supreme Court in *Firestone* [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989),] established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest.

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citations omitted).

However, the Eleventh Circuit recognized that *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), implicitly overruled the heightened arbitrary and capricious standard by clarifying that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1360 (11th Cir. 2008).  Further, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

The Eleventh Circuit has since established the following six-step test for evaluating a plan administrator's decision:

(1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether [s]he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and [s]he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review [her] decision under the more deferential arbitrary and capricious standard).[11]

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if [s]he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

(6)    If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Met. Life Ins. Co.*, 644 F. 3d 1350, 1355 (11th Cir. 2011) (per curiam) (citing *Capone*, 592 F.3d at 1195).

While "[a]ll steps of the analysis are 'potentially at issue' when a plan vests" the administrator with discretion to make benefits determinations, some courts begin their analysis assuming the plan administrator's decision was wrong, thereby "bypass[ing] the *de novo* right or wrong determination,

---

[11] In ERISA, the terms "arbitrary and capricious" and "abuse of discretion" are used interchangeably. *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. 2008).

and proceed[ing] directly to an arbitrary and capricious analysis." *Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1287 n.19 (M.D. Fla. 2013), *aff'd*, 563 F. App'x 658 (11th Cir. 2014); *see also Braden v. Aetna Life Ins. Co.*, 597 F. App'x 562, 566 n.2 (11th Cir. 2014) ("To further judicial economy, the Eleventh Circuit sometimes starts at the third step.").

"If the *de novo* standard applies, a district court reviewing a benefits determination 'is not limited to the facts available to the Administrator at the time of the determination.'" *Crume*, 417 F. Supp. 2d at 1271. "[I]f the arbitrary and capricious standard applies, 'the administrator's fact-based determinations will not be disturbed if reasonable[,] based on the information known to the administrator at the time the decision was rendered.'" *Id.* "As long as the decision had a reasonable basis, it 'must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion.'" *Murray v. Hartford Life & Accident Ins. Co.*, 623 F. Supp. 2d 1341, 1352 (M.D. Fla. 2009) (citing *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008)).

"A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Blankenship*, 644 F.3d at 1355. But "[e]ven where a conflict of interest exists, courts still 'owe deference' to the plan administrator's 'discretionary decision-making' as a whole." *Id.* (quoting

*Doyle*, 542 F.3d at 1363).  "The deference is due both for the administrator's plan interpretation and for [her] factual determinations."  *Id.* at 1355 n.6 (citing *Torres v. Pittston Co.*, 346 F.3d 1324, 1326 (11th Cir. 2003)).  "The question is not whether the court or anybody else would reach a different conclusion from the plan administrator, but rather whether the record reasonably supports the administrator's decision."  *Kaviani v. Reliance Standard Life Ins. Co.*, 799 F. App'x 753, 757 (11th Cir. 2020) (citing *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002)).  "Whether the administrator had a reasonable basis for its denial of benefits is 'based upon the facts as known to the administrator at the time the decision was made.'"  *Id.* (quoting *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).  "If the 'evidence is close,' then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision."  *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306, 1310 (M.D. Fla. 2009).

"Additionally, there is a 'fundamental requirement that a[ claims] administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process.'" *Jones v. AT&T Umbrella Benefit Plan No. 1*, No. 3:15-cv-821-J-34JRK, 2018 WL 748870 at *8 (M.D. Fla. Jan. 10, 2018) (report and recommendation

adopted by 2018 WL 746938 (M.D. Fla. Feb. 7, 2018)) (quoting *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 676 (11th Cir. 2014)) (brackets in original). "When a claim administrator's decision to deny benefits was based on an incomplete administrative record, 'the proper course of action is to remand [the] claim to [the claims administrator].'" *Id.* (quoting *Melech*, 739 F.3d at 676) (internal citation omitted) (brackets in original).

## IV. Discussion

### A. Summary of the Parties' Arguments[12]

In its Motion, Defendant first contends that the Plan Administrator's denial of Plaintiff's request for benefits was *de novo* correct because she "correctly found that Plaintiff's voluntary resignation disqualified him from receipt of severance benefits under the terms of the Plan."[13] (Doc. 32 at 2, 18-20.) Alternatively, Defendant argues that the Plan Administrator's decision was reasonable under the arbitrary and capricious standard of review "in light of Plaintiff's inconsistent positions regarding his departure, contemporaneous notes from Mr. Goldman and Ms. Sorfleet evidencing

---

[12] For the sake of brevity, the undersigned does not summarize the arguments presented in the parties' responsive briefs to the Motions.

[13] Of note, Defendant asserts that Plaintiff now "concedes he no longer seeks benefits under the 'Good Reason' prong of the Plan" and instead relies solely on his argument that he did no resign and was involuntarily terminated. (Doc. 32 at 4, 19.)

Plaintiff's resignation, and the Plan terms." (*Id.* at 2, 20-21.) Defendant contends, in part, that "even though Plaintiff denies that he resigned, his conflicting account of events does not render the Administrator's decision unreasonable in light of the evidence supporting the Administrator's findings" as "[t]he Plan gives the Administrator the discretion to make benefit determinations, which include the ability to weigh conflicting evidence and credit one version of events over another." (*Id.* at 23.)

Defendant also argues that any structural conflict of interest does not outweigh the deference owed to the Plan Administrator's decision, and claims there is a lack of evidence that any conflict of interest tainted the Administrator's decision or "otherwise converted it into an unreasonable decision." (*Id.* at 24.) Defendant asserts that "[e]ven if the Court factors in the potential conflict of interest," the Administrator's decision is supported by the record, which "contains a reasonable basis for the denial decision" and must, therefore, "be affirmed under the arbitrary and capricious" standard of review. (*Id.* at 24-25.)

In his Motion, Plaintiff contends that he is entitled to summary judgment because "Defendant accepted as a 'resignation' his mere inquiry about possible severance, and effectively terminated him under the Plan, entitling Plaintiff to benefits." (Doc. 33 at 1-2.) Plaintiff contends that, by law, his statements and actions did not constitute a resignation and he was

terminated. (*See id.* at 10-12.) Plaintiff also argues that under the first step

of the six-part test, the Plan Administrator's decision was *de novo* wrong

because he was "involuntarily terminated without cause before expiration of

the Plan." (*Id.* at 13-14.) At step two, Plaintiff concedes the Plan

Administrator had discretion to interpret the Plan's provisions but argues

that her denial decision was "based on a wrongful interpretation of law" and

is thus not entitled to deference because the *de novo* standard applies to

questions of law. (*Id.* at 15 (citing *Dial v. NFL Player Supplemental*

*Disability Plan*, 174 F.3d 606 611 (5th Cir. 1999); *Well v. Ret't Plan Admin.*

*Comm. of Terson Co., Inc.*, 913 F.2d 1045 (2d Cir. 1990)).)

Next, Plaintiff contends that at steps three and four, the Plan

Administrator's decision "was procedurally inadequate, was not supported by

reasonable grounds[,] and was arbitrary and capricious." (*Id.* at 15-18.) He

also contends, *inter alia*, that because the Administrator failed to "undertake

a full and fair review," her denial decision is not entitled to deference. (*Id.* at

18.) Thus, he contends, the inquiry should end, and the Administrator's

decision reversed. (*Id.* at 19.)

If the Court determines that additional analysis is warranted, Plaintiff

also argues that at steps five and six, the Plan's structural conflict and the

Plan Administrator's "personal" conflict of interest, including her role "as a

decision-maker and fact witness," had a "substantial impact upon the Plan

Administrator's denial decision." (*Id.* at 19-21.) He maintains that these conflicts of interest should be accorded "significant weight in supporting the Court's determination that the Plan Administrator's actions were arbitrary and capricious." (*Id.* at 21.) Plaintiff concludes that "[b]ecause the record in this matter, taken as a whole could not lead a reasonable trier of fact to find for Defendant," the Court should enter summary judgment in Plaintiff's favor. (*Id.*)

## B.    Analysis

As an initial matter, the Plan vests the Plan Administrator with discretionary authority in "determining the eligibility for benefits and construing and interpreting the terms of the Plan," as well as the authority, "at [her] discretion, to delegate [her] responsibility to others." (Doc. 1-1 at 11.) Because this discretionary authority is sufficient to trigger the deferential arbitrary and capricious standard, the undersigned assumes, without deciding that the Administrator's decision was *de novo* wrong, and proceeds to analyze whether the decision was arbitrary and capricious, beginning at the third step.[14] *See Howard*, 929 F. Supp. 2d at 1287 n.19

---

[14] The undersigned is unpersuaded by Plaintiff's argument that "no discretion is due the Administrator as to the legal issue of whether he was terminated" and that the decision should be reversed on this point. (Doc. 33 at 15.) Although Plaintiff contends that the *de novo* standard applies to the Administrator's determinations involving questions of law, one page later, Plaintiff states that "[t]he arbitrary and capricious standard applies to both the administrator's legal

(bypassing the *de novo* right or wrong determination and proceeding directly to an arbitrary and capricious analysis); *see also Mathis v. CSX Corp. Short Term Disability Plan*, No. 3:16-CV-1386-J-32PDB, 2018 WL 1364021, at *10 (M.D. Fla. Jan. 25, 2018) (report and recommendation adopted by 2018 WL 1326876 (M.D. Fla. Mar. 15, 2018)) (citing *Till v. Nat'l Life Ins., Co.*, 678 F. App'x 805, 808 (11th Cir. 2017); *Braden*, 597 F. App'x at 566 n.2) ("To further judicial economy, the Court may forgo the de novo review (step one) and proceed to the easier issue of whether [the administrator's] decision is arbitrary and capricious (step three).") (footnote omitted).[15]

Thus, even if the Court determines that the Administrator's decision was *de novo* wrong, it should still be upheld so long as there was a reasonable basis for the decision "based upon the facts as known to the [A]dministrator at the time the decision was made." *Townsend*, 295 F. App'x at 976; *see also*

---

conclusions and factual findings." (*Id.* at 15-16 (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997).)

Defendant specifically counters that the arbitrary and capricious standard of review applies even to the Administrator's legal interpretations and that the two cases cited by Plaintiff to support the proposition that the *de novo* standard applies to legal determinations, *Dial*, 174 F.3d at 611 and *Weil*, 913 F.2d 1045, are unavailing as "the Eleventh Circuit has rejected the reasoning applied by those out-of-circuit decisions." (*See* Doc. 40 at 11-12 (citing in part *Paramore*, 129 F.3d at 1451).) These counterarguments are well-taken.

[15] Here, the Plan also specifically provides that "[a]ny decision on final appeal will be final, conclusive and binding upon all parties" and that it is "the Company's intent that any challenge to a denial of benefits on appeal under the procedures, the court of law . . . will apply to a deferential ('arbitrary and capricious') standard and not a de novo review." (AR 12-13.)

*Pinto*, 2011 WL 536443 at *9 (starting the analysis at step two, as if defendant's "decision, were it reviewable under the *de novo* standard, was in fact wrong," where the defendant had discretion under the policy over both the eligibility determinations and term construction).

### *Step Three: Reasonable Grounds for Denial*

At step three, the Court must review the Plan Administrator's decision under the arbitrary and capricious standard and determine whether it is supported by "reasonable grounds." *Blankenship*, 644 F.3d at 1355. The Court is "limited to deciding whether the [Plan Administrator's] interpretation of the plan was made rationally and in good faith." *Cagle v. Bruner*, 112 F.3d 1510, 1518 (11th Cir. 1997). The Plan Administrator's decision "need not be the best possible decision, only one with a rational justification." *Griffis v. Delta Family-Care Disability*, 723 F.3d 822, 825 (11th Cir. 1984). "As long as a reasonable basis appears for [the Plan Administrator's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." *Jett*, 890 F.2d at 1140.

Additionally, in "[d]etermining whether a benefit denial was reasonable," the Court must "consider the evidence available to the claims administrator at the time of the denial." *Jones*, 2018 WL 748870 at *9 (citing *Blankenship*, 644 F.3d at 1354). "For purposes of judicial review, the

relevant date is the date [the Plan Administrator's] decision became final upon the conclusion of its administrative review." *Id.* (internal citations and quotation marks omitted) (alteration adopted).

First, the undersigned recommends that the evidence available to the Plan Administrator at the time of the denial, as reflected in the administrative record, establishes that her decision was reasonable. As Defendant argues:

> Here, the Administrator conducted repeated thorough reviews of Plaintiff's claim for severance benefits. Ms. Sorfleet considered Plaintiff's submissions and arguments and weighed them against evidence presented by Mr. Goldman, and her own contemporaneous notes regarding Plaintiff's separation. The Administrator determined that Plaintiff did not have Good Reason to resign—a decision he no longer contests. The Administrator also found that Plaintiff had voluntarily left employment, rather than being involuntarily terminated. That decision is reasonable in light of Plaintiff's inconsistent positions regarding his departure, contemporaneous notes from Mr. Goldman and Ms. Sorfleet evidencing Plaintiff's resignation, and the Plan terms.

(Doc. 32 at 21.)

Specifically, Defendant notes:

> The administrative record shows that Plaintiff announced his resignation on February 12, 2019, stating that he wanted to work out the timing and details to leave "soon." [AR 3, 63]. Plaintiff also asked for severance, asserting Good Reason to resign. [AR 60]. When his manager, Nathan Goldman, told Plaintiff on February 15, 2019 that CSXT accepted his resignation, Plaintiff did not dispute the characterization of his

separation as a resignation.[16] [AR 61]. Instead, Plaintiff removed his possessions from his office over the next few days and announced his separation to his team on February 19, 2019. [AR 27, ¶ 17; AR 60-61, 64].

In subsequent communications with Diana Sorfleet, Executive Vice President and Chief Administrative Officer, and the Plan Administrator, Plaintiff admitted initiating discussions about resigning, but stated he was "willing to stay as long as necessary and allow for a smooth transition *if* an agreement could be reached" on severance. [AR 2] (emphasis added); *see also* [AR 21]. He also continued to assert he had Good Reason to resign. [AR 23].

The Plan expressly excludes a participant from receiving benefits if his termination occurs by reason of a "[v]oluntary termination or voluntary retirement other than for Good Reason." [AR 7].

(Doc. 40 at 3-4.) As this evidence in the administrative record shows, the Administrator had a reasonable basis for her determination that Plaintiff resigned, that he did so without Good Reason, and that he was not terminated. (*See generally* AR 60-61 (the Plan Administrator's contemporaneous notes detailing her interactions and discussions with Plaintiff regarding his resignation) & AR 62-64 (Mr. Goldman's February 20,

---

[16] Although Plaintiff contends that the Plan Administrator failed to consider his "*immediate* refutation of any claimed resignation," (Doc. 32 at 14), he did not challenge his "resignation" until February 22, 2019, eight days after the February 15, 2019 meeting where Mr. Goldman and Ms. Sorfleet accepted his resignation. (AR 60-61.) Instead of challenging Mr. Goldman's characterization of his separation as a resignation then, Plaintiff instead said "he did not want this to be contentious but he would notify the company in writing of his resignation and good reason for the severance." (*Id.*)

2019, email detailing his interactions and discussions with Plaintiff regarding his resignation).)

To the extent there was conflicting evidence, the Administrator weighed the evidence and investigated Plaintiff's claims. (*See, e.g.*, AR 29-30 ("Based on my review of your most recent correspondence and the facts surrounding your voluntary resignation, there is nothing to indicate that you voluntarily resigned for Good Reason as defined in the Plan, and, in any event, you never provided the required notice regarding any event you considered to be Good Reason. Further, you were not involuntarily terminated, as you told both me and others at the company that you no longer wanted to work at CSX and were ready to leave as soon as reasonably practicable."); AR 58-59 (confirming the Plan Administrator investigated Plaintiff's claims regarding his purportedly strained relationship with Mr. Goldman).) Thus, the undersigned recommends the Plan Administrator had a reasonable basis for her decision, based on the information and facts known to her at the time of the decision as reflected in the administrative record.

On the other hand, in arguing that the Plan Administrator's decision was procedurally inadequate, and thus arbitrary and capricious, Plaintiff claims in his Motion that "[t]he record shows that CSX generally ignored the formal Plan requirements, and instead issued severance awards to employees at the direction of managers, rather than based on compliance with Plan

requirements." (Doc. 33 at 16-17 (citations omitted).)  Based in part on extra-

record deposition transcripts and related exhibits,[17] Plaintiff further alleges:

> The Plan Administrator spoke orally with Plaintiff about
> severance, never even requiring him to submit the written
> request required by the Plan. . . .  The Administrator pre-judged
> the severance request before any formal application was made. . .
> .  The Administrator and Plaintiff's supervisor then met
> informally and decided to deny the oral severance inquiry and
> fire Plaintiff. . . .  The Plan Administrator failed to reasonably
> review whether Plaintiff had resigned, or the effect of his
> longstanding personal conflict with Goldman.  The Plan
> Administrator refused to consider Plaintiff's immediate
> refutation of any claimed resignation, despite the fact that it was
> submitted while he was still employed. . . .  The Plan
> Administrator refused to review evidence Plaintiff had requested
> her to review, that demonstrated that he had planned to continue
> his duties rather than resign. . . .  The Plan Administrator
> refused to recuse herself, even though she had been part of the
> decision to terminate Plaintiff by "accepting his resignation."
> The Plan Administrator never reasonably considered the effect of
> Plaintiff's immediate and repeated assertions that he had not
> resigned.

(*Id.* at 17-18 (internal citations and footnotes omitted).)

Thus, Plaintiff asserts, the Plan Administrator failed to conduct a full

and fair review, and her denial deserves no deference.[18]  (*Id.* at 18.)  Plaintiff

---

[17] The Court allowed the parties to engage in limited discovery regarding the
Plan Administrator's conflict of interest.  (*See* Doc. 21 (limiting discovery to the
factors announced in *Cerrito v. Liberty Life Assurance Co. of Boston*, 209 F.R.D. 663,
664 (M.D. Fla. 2002)).)

[18] In determining whether the Administrator conducted a full and fair review,
the Court is not required to accord deference to the Administrator.  *See Boysen v. Ill
Tool Works, Inc.*, 767 F. App'x 799, 806-07 (11th Cir. 2019).  Moreover, although
courts must first determine whether an administrator performed a full and fair
review before evaluating the administrator's decision to deny benefits, *see id.* at

also claims that the Plan Administrator "willfully and blindly ignored the circumstances of Plaintiff's so-called resignation and instead cherry picked only the information she deemed supportive of denial" and that "[h]er biased review is *per se* arbitrary and capricious." (*Id.* (citations omitted).)

The undersigned agrees with Defendant that review should be limited to the administrative record, *see Blankenship*, 644 F.3d at 1354, which shows that the Plan Administrator conducted a full and fair review of Plaintiff's claims. *See Howard*, 929 F. Supp. 2d at 1291 ("On the record in this case, [claimant's] allegations of bias or procedural abnormality are insufficient to warrant consideration of the additional evidence offered by [claimant] in its arbitrary and capricious review."). Nevertheless, even if the Court were to review evidence outside of the administrative record to determine whether the Administrator conducted a full and fair review, such evidence corroborates the evidence in the administrative record establishing that the Administrator's decision was not arbitrary and capricious. *See, e.g., Bloom v. Hartford Life & Accident Ins. Co.*, 917 F. Supp. 2d 1269, 1278 (S.D. Fla. 2013) (permitting "extra-record materials pertaining to [claimant's] accusations that [the claim administrator] deviated from its own claims practices, and thus failed to provide a full and fair review" but refusing to permit "extra-

807, the undersigned finds Plaintiff's arguments to ultimately be unavailing and thus engages in this analysis at the third step as raised in Plaintiff's Motion.

record evidence offered to substantively impact [claimant's] eligibility for

benefits").

> According to Defendant:
>
>> Plaintiff announced his resignation to both Mr. Goldman and Ms.
>> Sorfleet. His own submissions concede that he raised the issue of
>> resigning and sought severance. Plaintiff also admitted that the
>> only witnesses to his resignation discussion were Mr. Goldman,
>> Ms. Sorfleet, and himself. Pl. Dep. 46:14-19. The Administrator
>> properly considered relevant statements and information from
>> those three witnesses. An administrator is not "obliged to search
>> for and consider every document submitted by identification."
>> *Boysen*[], 767 F. App'x [at] 811 []. Here, the Administrator did
>> not consider Plaintiff's calendar entries or emails to non-
>> witnesses to be relevant to the question of whether Plaintiff told
>> Mr. Goldman and Ms. Sorfleet that he was resigning. (Sorfleet
>> Dep. 61:8-10; *see also* Goldman Dep. 42:22-25).)

(Doc. 40 at 14.) Defendant contends "that decision did not deprive Plaintiff of

a full and fair review[,]" especially where the Administrator considered and

had access to the statements provided by all three witnesses. (*Id.* at 14-15.)

Defendant also maintains that the Administrator properly considered

Plaintiff's claims "that he and Mr. Goldman were not on good terms based on

friction over an internal audit conducted three years prior in 2016," as

evidenced by the following:

> Ms. Sorfleet testified that she asked outside counsel to
> investigate the issue. Sofleet Dep. 65:6-66:21. She spoke to
> outside counsel, reviewed information related to the
> investigation, and met with the head of the Audit Committee.
> Sorfleet Dep. 77:9-79:3. She also reviewed the 360 Leadership
> Review, which Plaintiff submitted. Sorfleet Dep. 62:24-63:1,
> 64:18-21. She found no evidence of a strained relationship or

> hurt feelings on Mr. Goldman's part. Sorfleet Dep. 79:14-80:6;
> Goldman Dep. 65:2-24, 66:23-25.[19]

(*Id.* at 15.) Defendant also adds that the Plan Administrator "conducted repeated[,] thorough reviews of Plaintiff's claims for benefits" and "considered Plaintiff's arguments and weighed them against evidence presented by Mr. Goldman, and her own contemporaneous notes regarding Plaintiff's separation."[20] (*Id.*) As such, Defendant asserts, and the undersigned is persuaded, "Plaintiff received a full and fair review."[21] (*Id.*)

Defendant further refutes Plaintiff's allegation that it was improper for CSTX to make decisions regarding whether to pay severance through its managers. (*Id.* at 16.) Defendant states, in part, that "the Company" and not the Plan Administrator, must take certain actions under the Plan, and "[a] claim for benefits is made before the Plan Administrator only if the Company decides not to pay out severance benefits under the Plan and the employee wants to challenge the decision." (*Id.* (citing AR 6, 12).) Defendant claims

---

[19] This deposition testimony corroborates the Plan Administrator's letter dated October 22, 2019, responding to Plaintiff's "new" argument regarding his purportedly strained relationship with Mr. Goldman. (*See* AR 58-59.)

[20] Of note, Defendant also points out that Ms. Sorfleet and Mr. Goldman testified that they "documented their conversations with Plaintiff in the ordinary course of business." (Doc. 40 at 15 n.3.)

[21] Defendant asserts that even if the Court finds that the Administrator failed to consider evidence on an issue, the appropriate remedy would be a "remand to the Administrator." (Doc. 40 at 15 n.4 (citing *Levinson v. Reliance Sandard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001))).

"[t]here is nothing improper about the [C]ompany, through its managers, making such decisions." (*Id*.) The undersigned agrees.

The undersigned also finds Plaintiff's argument regarding other executives receiving benefits under the Plan as evidence that the Plan Administrator's decision in this instance was unfair, or otherwise "arbitrary and capricious," to be unavailing. (*Id*. at 16-17 (explaining, *inter alia*, that the executives referenced in Plaintiff's Motion were not appropriate comparators where they had not resigned and "CSTX's decision to pay[] severance in those specific instances [was] consistent with the Plan").) Here, the undersigned is persuaded by Defendant's arguments and recommends the evidence supports the conclusion that the Administrator conducted a full and fair review of Plaintiff's claims—including Plaintiff's claim he had Good Reason to resign, which he now concedes he is no longer pursuing.

Defendant further asserts that the Administrator's finding that Plaintiff "voluntarily left [his] employment, rather than being involuntarily terminated" was "reasonable in light of Plaintiff's inconsistent positions regarding his departure, contemporaneous notes from Mr. Goldman and Ms. Sorfleet evidencing Plaintiff's resignation, and the Plan terms." (Doc. 40 at 17.) Defendant contends the Plan Administrator reasonably determined the Company's acceptance of Plaintiff's resignation did not equate to an involuntary termination where the Plan does not provide benefits to those

who resign without Good Reason, does not require written notice[22] of a resignation without Good Reason, or any "specific notice period for a resignation," and does not prohibit but "instead expressly allows[] the Company to set a separation date following a resignation." (*Id.* at 17-18.)

As Defendant contends, Plaintiff's own submissions and deposition testimony support the Administrator's decision to deny benefits, and even if they did not, "Plaintiff has *at most* presented conflicting evidence as to his resignation." (*Id.* at 18 (emphasis added).) "In such cases," Defendant argues, "the Administrator is entitled to weigh and resolve conflicting evidence." (*Id.* (citing, *inter alia*, *Foglia v. Reliance Standard Life Ins. Co.*, Case No. 2:17-cv-97-FtM-99MRM, 2018 WL 4760793, at * 14 (M.D. Fla. July 24, 2018) (report and recommendation adopted by 2018 WL 4328216 (M.D.

---

[22] This point is particularly well-taken. The undersigned is unpersuaded by Plaintiff's arguments that the Administrator deviated from a requirement that a resignation must be in writing or that this purported deviation somehow shows that the Administrator's decision was arbitrary and capricious. In his Motion, Plaintiff asserts that "Defendant requires resignations to be written" (Doc. 33 at 7 (citing exhibits A-19, F-5, and excerpts from Ms. Sorfleet's deposition)), and in a footnote, argues that "[a]n employer's deviation from its requirements that resignations be in writing and for resigning employees to provide end dates supports the conclusion that an employee was fired and not terminated." (Doc. 33 at 11 n.17.")

However, this claim is unsupported by the exhibits cited by Plaintiff. For example, exhibit A-19 (Doc. 33-3 at 22) (informing employees of where to find "the most current resignation form letter" indicates that "Managers' [r]esponsibilities" include: "[r]eceiv[ing] verbal notification of employee's intent to retire or resign" and "[e]ncourag[ing] employees to access the online Retirement/Resignation Form through Employee Self Service and complete the requested information." (Doc. 33-3 at 22).

Fla. Sept. 11, 2018)).) Defendant explains that even if the evidence is close, the Administrator does not abuse its discretion by resolving conflicting evidence. (*Id.* (internal citation omitted).)

Here, the undersigned agrees with Defendant and recommends that the Plan Administrator's decision was reasonable based on the evidence available to her at the time of her decision, as reflected in the administrative record. While Plaintiff maintains that he did not actually resign, the Plan Administrator reasonably interpreted and understood his statements and actions to be a resignation based on what he mistakenly believed qualified as "Good Reason" under the Plan. The undersigned also recommends that Plaintiff fails to show that the Administrator deprived Plaintiff of a full and fair review such that the Administrator's decision would be rendered arbitrary and capricious.

Based on the foregoing, the undersigned is unpersuaded by Plaintiff's argument that the Administrator's decision was unsupported by reasonable grounds and should be reversed as such. Even if there is evidence to support a contrary decision, because the Administrator's decision is supported by a reasonable basis, it should be upheld. *See, e.g., Thompson v. Energizer Holdings, Inc.*, No. 6:08-cv-2052-Orl-35DAB, 2010 WL 11626519, at *8 (M.D. Fla. Oct. 13, 2010) (finding that reasonable grounds supported the administrator's decision to deny benefits on the basis that the claimant

voluntarily resigned, even though there was conflicting evidence in the record as to whether the claimant voluntarily resigned or was involuntarily terminated).

### *Steps Four to Six: Conflict of Interest*

Having determined that there was a reasonable basis supporting the Plan Administrator's decision, the undersigned next considers "whether [the Plan Administrator's] conflict of interest tainted its decision, thereby rendering its otherwise reasonable decision unreasonable.'" *Ferrizzi v. Reliance Standard Life Ins. Co.*, 792 F. App'x 678, 686 (11th Cir. 2019). "[T]his so-called structural conflict is merely a 'factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.'" *Id.* (quoting *Blankenship*, 644 F.3d at 1355). "Where a conflict exists and a court must reach step six, 'the burden remains on the plaintiff to show the decision was arbitrary." *Blankenship*, 644 F.3d at 1355 (quoting *Doyle*, 542 F.3d at 1360).

Conflict of interest, as a factor, will depend on the circumstances of each case. *Glenn*, 554 U.S. at 108. It "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117. On the other hand, "[i]t should prove less

important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision[-]making irrespective of whom the inaccuracy benefits." *Id.*

Defendant does not dispute that it operates under a structural conflict of interest as "the Plan Administrator makes eligibility determinations with benefits payable from the general funds of CSXT."[23] (Doc. 32 at 24 (citing AR 10, 14).) On the other hand, Plaintiff specifically argues that "the Plan Administrator herself was a decision maker and fact witness to the events at issue." (Doc. 33 at 20.) According to Plaintiff, the Plan Administrator "participated with Plaintiff's supervisor in terminating Plaintiff by 'accepting' his 'resignation,' and then rejected Plaintiff's objection to her own characterization of the separation as a resignation." (*Id.*) Plaintiff also implies that the Plan Administrator was incentivized to deny Plaintiff's claim because "[c]ost-cutting benefitted executive managers like the Plan Administrator" (*id.* at 20-21 (citing Exh. B at 76:3-76:12; Ex. A-14, Exh. A-

---

[23] Here, the Plan states, in relevant part, that "[a]ll severance payments and benefits under the Plan constitute unfunded obligations of the Company" and "[s]everance payments will be made, as due, from the general funds of the Company." (Doc. 1-1 at 8.)

15)), and argues that the "Plan Administrator essentially sat in judgment of her own actions, to her own benefit" (*id.* at 21 (footnote omitted)).

In its Response to Plaintiff's Motion, Defendant counters:

> No evidence establishes that any conflict of interest influenced the Administrator's decision. Plaintiff argues that part of an executive's overall performance review depends on the executive's budget [and] spend[ing]. ECF No. 33, 9. Plaintiff then jumps to the conclusion that Mr. Goldman had an incentive to terminate Plaintiff to save costs associated with his salary. *Id.* The record does not support Plaintiff's speculation. There were no discussions about cutting costs by abolishing Plaintiff's position. Sorfleet Dep. 76:24-77:2. There were also no discussions about the need to limit severance payouts or decrease the cost of severance. Goldman Dep. 17:5-15. Instead, the record shows that Plaintiff's half-million-dollar salary is not a significant amount when compared to CSX's annual revenue of approximately $12 billion. . . .

(Doc. 40 at 19 (internal citations omitted in part).)

Defendant also counters that Plaintiff's efforts to paint the Plan Administrator "as self-interested fail" and argues that:

> Ms. Sorfleet, in her human resources role, was a fact witness to the discussions surrounding Plaintiff's resignation. But Plaintiff has presented no evidence that her role as a fact witness rendered her unable to perform her job duties as Administrator of the Plan. Sorfleet Dep. 51:8-10. To the contrary, she had no issues evaluating the record and confirming that Plaintiff had indeed resigned without Good Reason, thus disqualifying him from benefits under the Plan terms.

(*Id.* at 20.) Defendant contends that Plaintiff had not met his burden to show that the Administrator's decision was arbitrary, and that it is not Defendant's "burden to prove its decision was not tainted by self-interest."

(*Id.*)  Defendant adds that even if the Court factors in the "potential conflict of interest, the record contains a reasonable basis for the denial decision, and it must be affirmed under arbitrary and capricious review."  (*Id.* (citation omitted).)

The undersigned recommends that Defendant has the better arguments.

> When a conflict of interest exists, the burden remains on the plaintiff to show the decision was arbitrary and capricious; the defendant need not show the decision was not tainted by self-interest, *Doyle*[], 542 F.3d [at] 1360[], and deference remains owed to the plan administrator, *Blankenship*, 644. F.3d at 1355. A conflict is more important if there is a history of bias and less important if administrators are separate from those controlling funding. []*Glenn*, 554 U.S. [at] 117[].

*Ferrizzi v. Reliance Standard Life Ins. Co.*, No. 3:16-CV-1439-J-39PDB, 2018 WL 1866100, at *8 (M.D. Fla. Feb. 12, 2018), (report and recommendation adopted by 2018 WL 1866101 (M.D. Fla. Mar. 28, 2018)), *aff'd*, 792 F. App'x 678 (11th Cir. 2019).  Although Plaintiff maintains that the Plan Administrator was biased and faced an additional conflict of interest as a "material witness," Plaintiff nevertheless fails to meet his burden of demonstrating that the Administrator's decision was tainted by self-interest, such as showing a history of bias, or lacking in evidentiary support sufficient to render her findings arbitrary and capricious.

Even considering Defendant's structural conflict of interest, the Administrator's decision was not unreasonable, and therefore was not arbitrary and capricious. The structural conflict of interest asserted by Plaintiff is "an unremarkable fact in today's market." *Blankenship*, 644 F.3d at 1356; *Howard*, 929 F. Supp. 2d at 1301 (noting that "[t]he financial conflicts of interest about which [the claimant] complains, in the form of company profitability, employee compensation and bonuses, and administrator payment to reviewing health care providers, are 'an unremarkable fact in today's marketplace'") (citation omitted). As Defendant recognized, "Plaintiff's half-million-dollar salary is not a significant amount when compared to CSX's annual revenue of approximately $12 billion." (Doc. 40 at 19.)

Thus, the high value of Plaintiff's salary, and presumably even the severance benefits at stake, is insufficient to transform the Plan Administrator's reasonable decision into one that is arbitrary and capricious. *See Howard*, 929 F. Supp. 2d at 1301 (finding that the high value of the plaintiff's claim and the fact that it was reported in her claim file was not sufficient to transform the claim administrator's decision into being arbitrary and capricious); *see also Blankenship*, 644 F.3d at 1357 ("[W]e are not persuaded that the record in this case shows that the conflict itself or the large size of [plaintiff's] requested claims create sufficient concern for a court

to deem [the insurer's] benefits decisions arbitrary and capricious. . . . Even half a million dollars—a large sum, to be sure—is a relative amount when the plan administrator is a global, Fortune 100 company with annual revenues exceeding $50 billion.").

The undersigned also recommends that Plaintiff's allegations that the Plan Administrator operated under an additional conflict as a "material witness" or that she, or Mr. Goldman, had a financial incentive to terminate Plaintiff, are speculative at best and, in any event, are not sufficient to render the Administrator's decision arbitrary and capricious where there was a rational basis for the Administrator's decision. The Plan Administrator thoroughly investigated Plaintiff's claim[24] and Plaintiff has not provided persuasive evidence that the Administrator was biased, had a personal conflict of interest, or that her decision was affected by the fact that CSXT funded the Plan.

Thus, Plaintiff has not met his burden of establishing "persuasive indicators" that a conflict has "so tainted [the Administrator's] decision so as

---

[24] As to Plaintiff's arguments regarding the Plan Administrator's purported failure to provide a full and fair review of his claim, the undersigned also notes that, to the extent those arguments have any bearing on the analysis at the sixth step, the "procedural irregularities" alleged by Plaintiff "were, if they indeed existed, 'de minimus in nature' and did not impact" the Plan Administrator's full and fair review of Plaintiff's claims. *See Howard*, 929 F. Supp. 2d at 1301 n.31 (quoting *Bloom*, 917 F. Supp. 2d at 1288)). Here, Plaintiff failed to "demonstrate that these procedural violations amounted to a conflict of interest with sufficient inherent or case-specific importance." *Id.* (internal citations and quotation marks omitted).

to render it arbitrary and capricious." *Howard*, 929 F. Supp. 2d at 1301 (internal citations omitted). Because the Plan Administrator had a reasonable basis to deny Plaintiff's request for severance benefits under the Plan, this decision "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White*, 542 F.3d at 856 (quotation marks and internal citation omitted).

## V. Conclusion

For the foregoing reasons, the undersigned recommends that the Plan Administrator's decision denying Plaintiff's claim for benefits under the Plan be affirmed. *See Richey*, 608 F. Supp. 2d at 1310 (quoting *Doyle*, 542 F.3d at 1363) ("If the 'evidence is close,' then the administrator did not abuse its discretion and the requisite deference compels the affirmance of the administrator's decision.").

Accordingly, it is **RECOMMENDED** that:

1. Defendant's Motion (**Doc. 32**) be **GRANTED**.

2. Plaintiff's Motion (**Doc. 33**) be **DENIED**.

3. The Clerk of Court be directed to enter judgment in favor of Defendant and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ENTERED** in Jacksonville, Florida, on February 3, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record