IN THE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BRYAN RHODE,

     Plaintiff,

v.                         CASE NO.: 3:20-cv-480-MMH-MCR

CSX TRANSPORTATION, INC.,

     Defendant.

_____/

**<u>PLAINTIFF'S OBJECTIONS
TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLANTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff BRYAN M. RHODE, by and through his undersigned counsel, responds to the Report and Recommendation of the Honorable Monte C. Richardson. (Doc. 42). Objections to a Magistrate Judge's report and recommendation are reviewed *de novo*, *see* Fed. R. Civ. P. 72(b)(3) and 28 U.S.C. § 636(b)(1)(C), and a court should "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990).

In the instant case, the chief legal officer of a Fortune 500 company had a reporting relationship with a senior level employee with whom he previously was in conflict because of the compliance and reporting requirements

Plaintiff's position entailed. (Doc. 33-3 at 33). Due to the nature of his position's compliance functions, Plaintiff had Defendant's Board of Directors (the "Board") instituted strong employment protections, preventing Plaintiff's termination absent Board action. Doc. 33-1 at 76-77 (Rhode Dep. at 75:12-76:18).[1]

At Plaintiff's year-end annual review in February 2019, Chief Legal Officer Nathan Goldman and Plaintiff discussed whether Plaintiff might be eligible for severance. AR[2] at 2; AR at 23. Other vice presidents engaged in the same conversation with their supervisors during the same time period, leading to the award of severance pay under the Executive Severance Plan (the "Plan"). Doc. 33-5 at 256-58 (Goldman Dep. at 55:5-57:23); Doc. 33-5 at 366-68; Doc. 33-5 at 259-60 (Goldman Dep. at 58:13-59:1); Doc. 33-5 at 25 (Sorfleet Dep. at 24:15-24:22); Doc. 33-5 at 260 (Goldman Dep. at 59:8-59:18). The Chief Legal Officer informed Plaintiff on the spot that he was not eligible for severance, and to even be considered for severance he had to make a claim under the Plan. AR at 63. The Chief Legal Officer and Chief Administrative Officer then set a meeting with Plaintiff later that week, at which time the Plaintiff was told he

---

[1] Plaintiff did not learn of the Board's employment protections for his position until depositions in this case, over two years after his employment ended.

[2] Citations to the Administrative Record are abbreviated "AR" followed by the corresponding page number of the Administrative Record, with extraneous zeroes removed.

had effectively resigned, and he no longer needed to return to work. AR at 2; Doc. 33-1 at 96-97 (Rhode Dep. at 95:23-96:23). Plaintiff's credentials were removed, and he was escorted off the premises. AR at 2; AR at 27; AR at 64. Plaintiff has never deviated from his repeated assertions that he did not resign. *See* Doc-33-1 (Rhode Dep.); AR at 2; AR at 21; AR at 23; AR at 26-27; AR at 31-32.

Defendant's Chief Legal Officer supervised Plaintiff, but neither he nor the Chief Administrative Officer/Plan Administrator ever disclosed to Plaintiff that the Board had protected Plaintiff from termination. Doc. 33-1 at 131 (Rhode Dep. at 130:13-130:18). Unknown to Plaintiff, his supervisor could not terminate, demote, or diminish the responsibilities of Plaintiff. *Id.*, *see also* Doc. 33-2 at 67. Once the discussion of potential severance arose, the Chief Legal Officer (with the support of the person who would review their actions) could and did manufacture a "resignation," based only on a general willingness to discuss severance benefits.

A structural conflict of interest was created by Defendant's role in both paying the benefit in question and administering the Plan. Despite Plaintiff's protests to her involvement, the Plan Administrator, who had a serious personal conflict of interest, denied Plaintiff's appeals. For the Plan Administrative to have reversed herself in agreement with Plaintiff's position that he did not resign, the Plan Administrator would have had to admit that

she participated with another executive in Plaintiff's termination without cause, in direct contravention of the Board's directives. It would also mean the Plan Administrator would have to find that both she and another senior executive of Defendant's were untruthful, or, at best, handled the matter incompetently and in contravention of Defendant and Board requirements for terminating Plaintiff. While ERISA favors employers and their plan administrators, to deny relief to the Plaintiff in these circumstances would eviscerate the intentional protections of this important federal statute.

### A. The Report and Recommendation Fails to Address whether the Administrator was Erroneous on a Question of Law and thus whether the Administrator Acted Arbitrarily and Capriciously.

In the Eleventh Circuit, "[an ERISA] decision is arbitrary and capricious if it was made in bad faith, not supported by substantial evidence, *or is erroneous on a question of law.*" *Schreck v. Reliance Standard Life Ins*., 104 F. Supp. 2d 1373, 1376 (S.D. Fla. 2000) (emphasis added).[3] Use of an incorrect

---

[3] The Eleventh Circuit has held that, where discretion is conferred, a fiduciary's factual findings, as well as plan interpretations, are reviewable under the arbitrary and capricious standard. *See Paramore*, 129 F.3d at 1451; *Buckley v. Metropolitan Life Ins. Co.*, 115 F.3d 936, 940 (11th Cir.), *reh. denied*, 129 F.3d 617 (11th Cir. 1997). It appears to be an open question as to whether the same standard applies to pure questions of law as opposed to simple plan interpretations, but even if the arbitrary and capricious standard were to apply to both, it does not prevent a finding of abuse of discretion when the administrator utilizes the wrong legal standard. *See Pratt v. Petroleum Production Management Inc., Employee Sav. Plan & Trust*, 920 F.2d 651, 657 (10th Cir. 1990); *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 525-26 (7th Cir. 1996), cert. denied, 479 U.S. 1094

legal standard is an abuse of discretion, *Chicago Tribune Co. v. Bridgestone/Firestone Inc.,* 263 F.3d 1304, 1309 (11th Cir. 2001), and therefore *per se* arbitrary and capricious.[4] The legal standards for resignation are clear and require that a resignation may only be found where an employee communicates a firm decision to leave employment at a specified time.[5] Yet the Magistrate Judge never identified what, if any, legal standard was utilized by

_____

(1987); *Vizcaino v. Microsoft*, 120 F.3d 1006, 1013 (9th Cir. 1997), cert. denied, 522 U.S. 1098 (1998); *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F.2d 377, 380 (10th Cir. 1992). Other circuits have addressed legal questions under a *de novo* standard when factual determinations are reviewed under the arbitrary and capricious standard. *Coffin v. Bowater Inc.*, 385 F. Supp. 2d 38, 49 (D. Me. 2005), *aff'd*, 501 F.3d 80 (1st Cir. 2007); *Matassarin v. Lynch*, 174 F.3d 549, 563 (5th Cir. 1999); *Holt v. Winpisinger*, 811 F.2d 1532 (D.C. Cir. 1987); *O'Neil v. Retirement Plan for Salaried Employees of RKO Gen.*, 37 F.3d 55, 62 (2nd Cir. 1997); *Berger Transfer & Storage v. Central States Pension Fund*, 85 F.3d 1374, 1377-78 (8th Cir.1996).

[4] [F]or the purposes of evaluating a plan determination, there is no substantive distinction between the terms "arbitrary and capricious" and "abuse of discretion." *Paramore v. Delta Air Lines, Inc*., 129 F.3d 1446, 1450, n. 2 (11th Cir. 1997).

[5] *Chapman v. Fla. Dept. of Labor and Employment Sec*., 415 So. 2d 820, 821 (Fla. 2d DCA 1982) (employer telling employee to leave in response to employee's statement that he would leave the job amounted to a termination); *State v. Murphy*, 97 P. 391 (Nev. 1908) (holding employee gave prospective resignation able to be withdrawn when employee stated intent to resign two months from the date of delivering his resignation letter); *Bank One, Cleveland, N.A. v. Mason*, 582 N.E.2d 1085 (Ohio Ct. App. 1990) (same); *State v. Huff*, 87 N.E. 141, 143 (Ind. 1909) ("In order to constitute a resignation, it must be unconditional, with intent that it shall operate as a resignation."); *Iron Workers Local* 627, 298 N.L.R.B. 29, 1990 WL 122342, at *5 (1990) ("The statement [that union member is going to resign] is not time specific nor can it be construed as an inartful demand to withdraw from the Union at that moment in time"); *State ex rel. Landis v. Heaton*, 180 So. 766, 769 (Fla. 1938) (a resignation is not immediately effective unless it is unconditional.).

the Administrator in making her decision to treat Plaintiff's severance inquiry as a resignation nor analyzed whether that decision was erroneous.

The Administrator in this matter determined that Plaintiff had resigned under any recognized standard for a resignation. Instead, as reflected in the administrative record, and relied upon in the Report and Recommendation, the Administrator determined that Plaintiff resigned because "you were not involuntarily terminated, as you told both me and others at the company that you no longer wanted to work at CSX and were ready to leave as soon as reasonably practicable."[6] Doc. 42 at 46, citing AR 59. Repeating this assertion by the Administrator, the Magistrate concludes (in the next sentence of the Report and Recommendation), "the undersigned recommends the Plan Administrator had a reasonable basis for her decision . . .". Doc. 42 at 46. Without recognizing a standard under which the Administrator's legal determination of resignation could be erroneous, the Magistrate Judge could not, as a matter of law, determine if the Administrator's subsequent decision to deny benefits to an employee who "resigned" was, in fact, arbitrary and capricious.[7]

---

[6] Sorfleet admitted in deposition that the "others" to whom she referred consisted only of the one person who purportedly heard Plaintiff utter words constituting a resignation – words which Defendant has never specified. Doc. 33-5 at 70-72 (Sorfleet Dep. 69:8-71:3).

[7] At footnote 14 of the Report and Recommendation, the Magistrate Judge mischaracterizes Plaintiff's treatment of the six-part ERISA test as inconsistent,

Plaintiff never gave a date (or even an approximate date) of resignation and never provided a written notice of resignation, and instead was notified after a discussion at his annual review about severance that his "resignation" was "accepted"; he was assigned a termination date by the Administrator; and he was immediately directed to leave the premises. Doc. 33-5 at 16, 43-44, 48 (Sorfleet Dep. at 15:1-15:3, 42:4-42:12, 42:25-43:5, 47:6-47:12); Doc. 33-5 at 225, 252 (Goldman Dep. at 24:1-24:3, 51:22-52:1). Goldman and Sorfleet describe Plaintiff's supposed potential departure timeframe inconsistently— from no definite time frame, to "2019," to "soon," to "right away," to "as soon as reasonably possible"—but concede Plaintiff never gave a specific date or said what he would do if severance was not available. Doc. 33-2 at 30-31; Doc. 33-5 at 14-15, 36 (Sorfleet Dep. at 13:25-14:23; 35:8-35:10); Doc. 33-5 at 225, 235, 254-55 (Goldman Dep. at 24:1-24:3, 24:22-24:25, 34:15-34:17, 53:24-54:1, 54:18-54:22). To date, Defendant has never stated what words it alleges Plaintiff said that purportedly amounted to a resignation. No authorities cited

---

claiming that insisting upon a legal standard for a resignation is only an issue at step one, and not a basis for finding the Administrator's determination arbitrary and capricious. Doc. 42 at n.14. What Plaintiff argued, and what footnote 14 omits, is that "[a] decision is arbitrary and capricious if it . . . is erroneous on a question of law." *Schreck*, 104 F. Supp. 2d at 1376. Thus, if the fact finder determines that a plan administrator erroneously treated an employee as if he resigned when in fact he was terminated, the legal standard used to define "resignation" is part of the arbitrary and capricious analysis. and using a wrongful legal standard is *per se* arbitrary and capricious. The Magistrate Judge skips over the crucial link between the legal determination and the arbitrary and capricious review.

by Defendant suggest that a mere discussion with one's supervisor of the possibility of severance is sufficient to constitute a resignation. By law, Plaintiff was terminated.

The Report and Recommendation cites other bases for "reasonableness" that do not meet the standard for ERISA litigation. First, the Magistrate Judge repeatedly claims Plaintiff "inconsistencies" (Doc. 42 at 38, 44, 51), which he does not explain or substantiate. The idea of "inconsistencies" of the Plaintiff was first raised by Defendant not in the administrative process but in its motion for summary judgment: "During the administrative claims review process, Plaintiff took the inconsistent positions that he had Good Reason to resign, while also arguing that CSXT involuntarily terminated his employment." Doc. 32 at 3. However, Plaintiff has always maintained that Defendant mischaracterized the discussion about severance at his annual review as a resignation,[8] when it was not. By terminating Plaintiff based on a preliminary severance discussion, Defendant forestalled any other options for Plaintiff under the Plan. Plaintiff's assertions of the facts surrounding

---

[8] In its Motion for Summary Judgment, Defendant states its position that if an employee enquires as to severance eligibility, the company considers that to be an effective resignation and that the resignation cannot be withdrawn even if the company determines the employee is not eligible for severance. Doc. 32 at 19.

his termination are and have always been entirely consistent,[9] and neither Defendant nor the Magistrate Judge cited anything to the contrary to support their unsupported allegations of inconsistency.[10]

The Magistrate gives weight to the fact that Plaintiff was permitted to return to the premises to retrieve his belongings and speak to his subordinates but ignores the other facts. The brief February 15, 2019 meeting was held only to permit Goldman and Sorfleet to announce that they "accepted" Plaintiff's "resignation,"[11] declare a termination date,[12] and tell Plaintiff, in Goldman's words, "he was expected to leave." Doc. 33-5 at 238-39 (Goldman Dep. at 37:20-38:17). Plaintiff's credentials were seized and he

---

[9] The Magistrate counters Plaintiff's assertion that he "immediately" clarified that he had not resigned, stating that Plaintiff waited eight days after the termination to do so. Doc. 42 at 14. The Magistrate failed to recognize, however, that Plaintiff's assertion took place before the effective date that Sorfleet had chosen as Plaintiff's last day of employment, AR at 2, 21, 22.

[10] The same cannot be said for the Defendant. Sorfleet stated in a July 16, 2019 letter that "you told me and 'others' at the company that you no longer wanted to work at CSX and were ready to leave as soon as reasonably possible." AR at 29-30. Sorfleet later admitted "others" was only Goldman. Doc. 33-5 at 70 (Sorfleet Dep. at 69:8-69:24). Goldman's February 20, 2019 announcement of Rhode's and Reinke's departures did not accurately convey the circumstances of Reinke's departure (*see* Doc. 33-5 at 366-68; Doc. 33-5 at 363), nor as Plaintiff alleges, his departure. Goldman drafted an elaborate memo following Plaintiff's departure to justify his and Sorfleet's "resignation" conclusion (AR at 63-64), even though he testified there was no doubt in his mind Plaintiff had resigned (Doc. 33-5 at 242 (Goldman Dep. at 41:14-41:18)), and therefore no reason to have to spend so much effort supporting a conclusion he claims could not reasonably be disputed.

[11] Doc. 33-5 at 37, 42 (Sorfleet Dep. at 36:7-36:11, 41:8-41:9); Doc. 33-5 at 237 (Goldman Dep. at 36:16-36:22)

[12] Doc. 33-4 at 82 (Sorfleet Dep. at 81:21); Doc. 33-5 at 238 (Goldman Dep. at 37:2-37:7).

was only permitted to return the following business day to retrieve his belongings and announce to his subordinates his departure under supervision by an HR representative. Doc. 33-5 at 43-45 (Sorfleet Dep. at 42:4-42:12, 43:24-44:13); *see also* AR at 60-61; Doc. 33-5 at 240 (Goldman Dep. at 39:1-39:5).

The Magistrate further concludes, "the Plan Administrator reasonably interpreted and understood his [Plaintiff's] statements and actions to be a resignation based on what he mistakenly believed qualified as "Good Reason" under the Plan." Doc. 42 at 53. Respectfully, this statement reflects a misunderstanding of "Good Reason" and the Plan provisions and supports a conclusion that Defendant impermissibly transformed an inquiry into a resignation. An employee is entitled to raise "Good Reason"[13] for a resignation that would entitle the employee to severance. AR at 6. If an employee asserts "Good Reason," the company may respond within thirty days to remedy the concerns and maintain an executive's employment. *Id*. The Magistrate Judge adopts Defendant's assertion[14] that a "Good Reason" inquiry constitutes a resignation which cannot be rescinded even if the employer does not grant severance, a conclusion nowhere supported by the Plan.

---

[13] Whether Plaintiff would have had "Good Reason" for other claims under the Plan is not at issue in this case, as each of the parties have conceded. *See* Doc. 32 at 4.
[14] Page 19, Defendant's Motion for Summary Judgment.

**B. The Magistrate Judge improperly skipped the requisite analysis of whether the Administrator performed a full and fair review before evaluating the Administrator's decision to deny benefits.**

Under ERISA, the proscription against arbitrary and capricious benefits decisions is embodied in the requirement that "the appropriate named fiduciary" provide a "full and fair review" of denied claims. 29 U.S.C. § 1133(2); *Boysen v. Ill Tool Works, Inc*., 767 F. App'x 799, 806-07 (11th Cir. 2019). A court must first decide whether a full and fair review was afforded under a *de novo* standard, prior to any review of the benefits decision. *Id*. An inadequate investigation can render a Plan Administrator's determination arbitrary and capricious. *Capone v. Aetna Life Ins. Co*., 592 F.3d 1189, 11991545 (11th Cir. 2010).

In response to Plaintiff's concerns over the fairness of the ERISA review, the Magistrate concludes simply that he "finds Plaintiff's arguments [about the absence of a full and fair review] to be unavailing" and impermissibly moves into making his case for reasonableness. Doc. 42 at n. 18 (internal citations omitted).

In the administrative appeal, Plaintiff made a very simple and easy-to-accommodate request to evaluate whether his amorphous interest in severance was more than a speculative discussion:  that the Administrator review his emails, files and computerized calendar and speak with the people who worked for him to evaluate Plaintiff's intent.  AR. at 21, 23-24.  The Plan Administrator

11

did not consider any records of communications that Plaintiff may have had with subordinates, peers, or others in the company as to whether he had planned to resign or did resign, despite Plaintiff's request she do so. Doc. 33-5 at 60-61 (Sorfleet Dep. at 59:25-60:4); *see also* AR at 23-24. Plaintiff explained that the documents maintained by CSX (to which he no longer had access) would clearly support the conclusion that he had no specific intent to resign. *Id.*[15] For a high-ranking position such as Plaintiff's it would, indeed, be shocking for an executive to have failed to take actions in preparation to resign, and an electronic record of his planned activities would reflect an intent to remain or stay. To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary must consider any and all pertinent information reasonably available to him. *Grossmuller v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, Local 813*, 715 F.2d 853, 857 (3d Cir. 1983); *Toland v. McCarthy,* 499 F. Supp. 1183, 1190 (D. Mass. 1980); *Teeter v. Supplemental Pension Plan of Consol. Rail Corp.*, 705 F. Supp. 1089, 1095 (E.D. Pa. 1989); *Hammer v. First Unum Life Ins. Co.,* 01 Civ. 9307, 2004 WL 1900334 at *5 (S.D.N.Y. Aug. 25, 2004); *Crocco v. Xerox Corp.*, 956 F. Supp. 129, 139 (D. Conn.

---

[15] Plaintiff's calendar and ongoing planning and mentoring efforts for his team all suggest he was engaging in work as usual. *See* Doc. 33-5 at 377-389.

1997), aff'd in relevant part, *Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998). The Magistrate Judge erroneously accepted CSX's argument that reviewing Plaintiff's calendar entries or interviewing his subordinates to determine whether Plaintiff had actually planned to resign would have no bearing on the Administrator's determination that Plaintiff had resigned. Doc. 42 at 49. If an appropriate standard of "resignation" had been used, the Administrator could have easily reviewed documents that clearly supported the conclusion that Plaintiff had not resigned. It was not, and she did not.

As addressed further below, the Administrator in this matter is the same person who effectively fired Plaintiff by deeming his interest in severance benefits to be a resignation. While the implicit bias of a decision-maker creates a conflict of interest, it also serves to deny an ERISA "full and fair" hearing. A full review is meaningless if it is fixed from the beginning.[16]

---

[16] Sorfleet herself admits that her decision to terminate Plaintiff was, in her mind, not subject to an appeal process:

Q. Okay. And in the letter he states that he was involuntarily terminated; is that right?
A. Let me read it. Yes.
Q. All right. And he asked for an appeal; is that correct?
A. Yes.
Q. Was there any appeal process available to him?
A. For the termination?
Q. Yes.
A. No.

Doc. 33-5 at 49 (Sorfleet Dep. at 48:6-48:15).

In failing to recognize any standard for a resignation, the Magistrate failed also to understand the importance of Defendant's admission in its own motion for summary judgment. Defendant states: "[t]he Plan does not allow for an employee to request severance benefits under the Good Reason provision, and then revoke their resignation." Doc 32 at 19. Defendant therefore asserts that Plaintiff merely requested benefits based on "Good Reason" and thereby effectively "resigned." The Plan permits an employee to raise "Good Reason"[17] for a resignation that would entitle the employee to severance. AR at 6. The Plan then permits the employer to respond to the written asserted "Good Reason" within thirty days to address the asserted justifications for leaving. *Id.* Far from triggering an effective resignation, a severance inquiry to the Plan Administrator is a means under the Plan to permit the Defendant to remedy harm to the employee and maintain an executive's employment.

Defendant's interpretation, exemplified so clearly in its treatment of Plaintiff, is directly contrary to ERISA, the purpose of which is "promot[ing] the interest of employees and their beneficiaries,"[18] and the Plan, which emphasizes, "No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from

---

[17] Whether Plaintiff would have had "Good Reason" under the Plan is not at issue in this case, as each of the parties have conceded. *See* Doc. 32 at 4.

[18] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102, 109 S. Ct. 948, 950 (1989).

obtaining a welfare benefit or exercising your rights under ERISA." AR at 13. Neither the ERISA statute nor CSX's Plan are designed to penalize an employee for merely raising the issue of benefits under the Plan.  Defendant's position, and its conduct in this case, contradicts both the Plan document itself and the purposes of ERISA by penalizing a mere inquiry into severance eligibility and transforming it into a termination.

### C. The Response and Recommendation fails to weigh and consider the effect of a conflict of interest on whether the Administrator acted reasonably.

Magistrate Judge Richardson permitted Defendant to rely on an ERISA "appeal" process conducted by the very person who wrongfully[19] and in violation of a directive of the CSX Board of Directors[20] terminated Plaintiff. Sorfleet sat in judgment of the veracity of her own credibility, her own impressions, and her own actions as to whether she and another company executive had actually fired Plaintiff when they "accepted" as a resignation Plaintiff's inquiry into severance benefits.  In order for the Plaintiff to execute his critical compliance and law enforcement responsibilities, the Board had

---

[19] "If two or more persons shall agree, conspire, combine or confederate together . . . to cause the discharge of any person from work in such firm or corporation. . .  such persons so combining shall be deemed guilty of a misdemeanor of the first degree . . ." Fla. Stat. § 448.045. Civil liability under the statute is barred by the intracorporate conspiracy doctrine, *Israel v. Bellsouth Telecommunications, Inc,* 12-60806-CIV, 2012 WL 12862809, at *5 (S.D. Fla. July 10, 2012), but the doctrine does not apply to criminal conspiracies. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 (11th Cir. 2000).

[20] Doc. 33-1 at 131 (Rhode Dep. at 130:13-130:18).

directed Plaintiff could be terminated without cause only by the Board itself.[21]
For Sorfleet to have concluded Plaintiff did not resign would mean Sorfleet and
Goldman had violated the Board's directive.

The Magistrate Judge, however, dismissed Plaintiff's conflict claims
regarding Sorfleet, finding that Plaintiff had failed to prove that the
Administrator was "tainted by self-interest, such as showing a history of bias,
or lacking in evidentiary support sufficient to render her findings arbitrary and
capricious." Doc. 42 at 57.  He creates a *de facto* yet circular standard under
which she can believe herself as a fact witness, and in believing herself,
conclude that her decision is reasonable. ERISA, however, recognizes that a
conflict of interest analysis is case-specific:

> We believe that Firestone means what the word "factor" implies,
> namely, that when judges review the lawfulness of benefit denials,
> they will often take account of several different considerations of
> which a conflict of interest is one. This kind of review is no stranger
> to the judicial system. Not only trust law, but also administrative
> law, can ask judges to determine lawfulness by taking account of
> several different, often case-specific, factors, reaching a result by
> weighing all together.

*Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (citations omitted).

Conflicts must be evaluated and weighed, and entities are specifically warned

---

[21] Goldman and Sorfleet withheld from Plaintiff knowledge of these important Board
protections.  In fact, the Plaintiff did not learn of his Board-provided employment
protections until depositions in this case, over two years after his employment ended.
Doc. 33-1 at 131 (Rhode Dep. at 130:13-130:18).

to employ methods to ensure that biased individuals are not involved in the
review of claims:

> In such instances, any one factor will act as a tiebreaker when the
> other factors are closely balanced, the degree of closeness
> necessary depending upon the tiebreaking factor's inherent or
> case-specific importance. The conflict of interest at issue here, for
> example, should prove more important (perhaps of great
> importance) where circumstances suggest a higher likelihood that
> it affected the benefits decision, including, but not limited to, cases
> where an insurance company administrator has a history of biased
> claims administration. . . It should prove less important (perhaps
> to the vanishing point) where the administrator has taken active
> steps to reduce potential bias and to promote accuracy, for
> example, by walling off claims administrators from those
> interested in firm finances, or by imposing management checks
> that penalize inaccurate decisionmaking irrespective of whom the
> inaccuracy benefits.

*Id.*[22]

While *Newell v. Prudential Ins. Co. of Am.,* 904 F.2d 644, 650 (11th Cir.
1990), held that a paying entity having its "own employee make
determinations of medical need does not violate ERISA as a matter of law" and
that the same employee's later review did not create a conflict, no Eleventh
Circuit case has gone so far as permitting an administrator to evaluate claims

---

[22] Here, not only was Goldman not "walled off" from the Administrator's decision-
making process, he played an integral part. The Administrator admits that Goldman
not only instructed her before her review that the Plaintiff was ineligible for benefits
(Doc. 33-5 at 17 (Sorfleet Dep. at 16:7-16:11)), that he participated in her meeting
with Plaintiff to inform him he was deemed to have resigned (Doc. 33-5 at 41-42
(Sorfleet Dep. at 40::23-41:3), and that his legal department participated in her
review of her and Goldman's actions Doc. 33-5 at 51 (Sorfleet Dep. at 50:21-50:24);
Doc. 33-5 at 54 (Sorfleet Dep. at 53:6-53:8).

of misconduct that the administrator herself was alleged to have committed. Deference must have its limits. It offends any notion of fundamental fairness for an individual accused of misconduct to sit in her own judgment of her actions. Simply put, a person alleged of improper conduct should not be permitted to act as its own judge and jury as to the impropriety of that conduct. In *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Court addressed the implications of a decisionmaker reviewing his own decision, stating "[w]e agree with the District Court that prior involvement in some aspects of the case will not necessarily bar a welfare official from acting as a decision maker. He should not, however, have participated in making the determination under review." *Id.* at 271; *see also Roberts v. U.S.,* 357 F.2d 938, 944 (Ct. Cl. 1966) ("Thus, if the Secretary of the Smithsonian Institution should be considered as the contracting officer . . ., it would be improper for him to wear a second hat as head of the department under the disputes clause, for no man can review his own decision with the requisite degree of quasi-judicial detachment and impartiality."); *In re Murchison*, 349 U.S. 133, 137 (1955) (allowing judge to file charges and preside over trial violates due process).

Administrator Sorfleet was directly involved in making the determination under review—whether Plaintiff resigned his employment or was fired. Assuming the truth of Plaintiff's allegations, Sorfleet transformed an inquiry about Plan benefits into a voluntary quit, depriving Plaintiff of

substantial and valuable monetary benefits and acting contrary to her Board of Directors.   Based on this intensely self-interested conflict, there could be no alternative decision; there could be no full and fair review.

While the Magistrate Judge recommends finding a structural conflict, he dismisses without analysis its effect on the reasonableness analysis, stating simply that it was "insufficient to *transform* the Plan Administrator's *reasonable decision* into one that is arbitrary and capricious." Doc. 42 at 58. Step six of the 11th Circuit's ERISA claim denial review requires that a conflict of interest be taken into account by the court when undertaking its reasonableness review.  *Kaviani v. Reliance Standard Life Insurance Comp.*, 799 F. App'x 753, 756 (11th Cir. 2020). The severity of the conflict and impact of that conflict in any given case determines how much weight the conflict should be afforded in the court's reasonableness analysis. *Keys v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* 493 F. Supp. 3d 1147, 1167 (M.D. Fla. 2020*), appeal dismissed sub nom. Keys v. Bert Bell / Pete Rozelle NFL Players Ret. Plan,* 20-14031-GG, 2021 WL 2252144 (11th Cir. May 11, 2021) (citing *Blankenship*, 644 F.3d at 1355).  The point of step six of the ERISA analysis is that a jurist <u>cannot</u> find reasonableness without considering and weighing the impact of a conflict.  *Id*.; *Keys*, 493 F. Supp. 3d at 1167.  He cannot start with a reasonableness premise, which is exactly what the Magistrate impermissibly did here.

19

The Administrator's conflict was substantial, obvious, and egregious. The structural conflict, along with the enormous personal conflict of having an alleged wrongdoer evaluate her own actions in wrongfully terminating Plaintiff, certainly "should prove more important (perhaps of great importance)" because the "circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. If the Supreme Court deemed it necessary to warn insurance companies to create independent evaluators uninvolved with the initial decision to avoid bias, *id*, surely it would consider the prospect of an administrator reviewing her own alleged wrongful termination of an employee to weigh heavily against the reasonableness of a decision.

Respectfully submitted this 17th day of February 2022.

**DELEGAL & POINDEXTER, P.A.**

*/s/ T.A. "Tad" Delegal, III*
**T.A. DELEGAL, III, B.C.S.**
Fla. Bar No.: 892701
Email: tad@delegal.net
Secondary email: office@delegal.net
**JAMES C. POINDEXTER**
Fla. Bar No.: 0116039
Email: james@delegal.net
**ALEXANDRA E. UNDERKOFLER**
Fla. Bar No.: 1018209
Email: alex@delegal.net
424 E. Monroe Street
Jacksonville, Florida 32202

20

Telephone: (904) 633-5000
Facsimile: (904) 358-2850
Counsel for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I CERTIFY that the foregoing document was electronically filed with the

U.S. District Court on this 17th day of February 2022, via CM/ECF and was

served this day on Thomas R. Brice (tbrice@mcguirewoods.com) and Cameron

Kynes   (ckynes@mcguirewoods.com),   Attorneys   for   Defendant   CSX

Transportation, via CM/ECF and/or e-mail.

/s/ *T.A. "Tad" Delegal, III*
T.A. "Tad" Delegal, III